1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

JEFFERY VALE, an individual, ANDY BARBER, an individual, ANDREW PITTMAN, an individual, ANDREW STEWART, an individual, ANDREW YOUNG, an individual, ANN-MAREE TEDALDI, an individual, BRANON SNYDER, an individual, BRENT MATTILA, an individual, BRIAN PATERIK, an individual, DARRIN QUASCHNIK, an individual, DAVID DAHLIN, an individual, DENNIS STANLEY, an individual, ELSE HIEMESTRA, an individual, EMMANUEL HEARNE, an individual, ERIK SADLON, an individual, ERIK GOCHNOUR, an individual, IAN CONDON, an individual, JAMES O'CONNELL, an individual, JASON OVERSTREET, an individual, JESSE GORHAM, an individual, JOHN CIZIN, an individual, JOSEPH HICKEY, an individual, JOSEPH TOCHE, an individual, JOSHUA GIBBS, an individual, JOSHUA SCHAAPVELD, an individual, KENNETH WHITEHAIR, an individual, LANCE FISHER, an individual, MARK NELSON, an individual, MICHAEL PETERSON, an individual, MICHAEL TODD, an individual, PETER DENTON, an individual, ROB

**CASE NO. 2:23-cv-01095**

**COMPLAINT**

**JURY DEMANDED**

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

1     KILCUP, an individual, STEVEN
     COLLINS, an individual, STEVEN
2     ERICSON, an individual, THERESA
     MACMILLAN, an individual, TOM
3     NEWMAN, an individual, WAYNE
     JOHNSON, an individual, ZERO
4     IAULUALO, an individual,

5                 Plaintiffs,

6      v.

7     CITY OF SEATTLE, HAROLD
     SCOGGINS, Chief of the Seattle Fire
8     Department, ANDREW LU, an individual;
     SARAH LEE, an individual, JENNY
9     DURKAN, an individual,

10               Defendants.

11

12 **I.**     **INTRODUCTION**

13 1.    Plaintiffs are 38 (thirty-eight) City of Seattle Firefighters and one employee of the Fire

14      Department who were wrongfully denied accommodations and terminated, forced to

15      resign, or retire for non-compliance with a new State requirement for COVID-19

16      vaccination, who bring this "as applied" challenge against Defendants for discriminatory

17      application of the Proclamation to each Plaintiff in violation of their Constitutional and

18      statutory rights. Two Plaintiffs who were on medical disability at the time of the mandate

19      were continuously threatened with termination but remained employed. Plaintiffs come

20      to this Court to be made whole.

21 **II.**     **PARTIES**

22 2.    Defendant City of Seattle is a municipality located in King County, WA.

23

COMPLAINT                  2             **ARNOLD & JACOBOWITZ PPLC**
                                                 8201 164th Avenue NE, Suite 200
                                                    Redmond, WA 98052
                                                      (206) 799-4221

3.  Defendant Harold Scoggins is the Chief of the Seattle Fire Department (the "Department"), and is an employer, officer, vice principal and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Scoggins personally participated in and performed the acts and omissions complained of herein to advance his career and/or for the personal benefit and the benefit of his marital community.

4.  Defendant Andrew Lu, Human Resources Director of the Department and is an employer, officer, vice principal and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Lu personally participated in and performed the acts and omissions complained of herein to advance his career and/or for the personal benefit and the benefit of his marital community.

5.  Defendant Sarah Lee, Human Resources Director of the Department and is an employer, officer, vice principal and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Lee personally participated in and performed the acts and omissions complained of herein to advance her career and/or for the personal benefit and the benefit of her marital community.

6.  Defendant Jenny Durkan, former Mayor of the City of Seattle, was an employer, officer, vice principal and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Durkan personally participated in and performed the acts and omissions complained of herein to advance her career and/or for the personal benefit and the benefit of her marital community.

COMPLAINT                                    3                    **ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

7.   Plaintiff Jeffery Vale, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Vale was granted a religious exemption but was denied an accommodation and was terminated on or about May 31, 2022. Mr. Vale also had demonstrated and documented natural immunity through a positive COVID-19 antibody test and was denied a medical exemption in contravention to his physician's medical opinion against vaccination. Defendants did not perform an interactive dialogue with Mr. Vale before the decision was made to terminate, and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, on or about April 10, 2023, Plaintiff Vale was hired by Central Pierce Fire & Rescue and was fully accommodated with a religious exemption.

8.   Plaintiff Andrew Barber, an individual, is a Firefighter, formerly with the City of Seattle, who, during employment with the Department was a resident of Washington State. Mr. Barber resigned under duress on or about 22 August 2022 after he was granted a religious exemption but was denied an accommodation without an interactive dialogue and without identifying the undue hardship the Department would have suffered if an accommodation had been provided.

9.   Plaintiff Andy Young, an individual, is a Firefighter, formerly with the City of Seattle, who, during employment with the Department was a resident of Washington State. Mr. Young was wrongly denied a religious exemption and was never permitted to discuss a religious accommodation.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

10. Plaintiff John Cizin, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Cizin had suffered a work-related disability and was on Worker's Compensation when he was terminated on or about November 1, 2021. Defendants did not perform an interactive dialogue with Mr. Cizin before he was notified he would be terminated.

11. Plaintiff Steven Collins, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Collins was granted a religious exemption but was denied an accommodation and retired under duress on or about June 15, 2022. Mr. Collins also had demonstrated and documented natural immunity through a positive COVID-19 antibody test. Defendants did not perform an interactive dialogue with Mr. Collins prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

12. Plaintiff Brent Mattila, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Mattila was granted a religious exemption but was denied an accommodation and was terminated on or about December 8, 2022. Mr. Mattila also had demonstrated and documented natural immunity through a positive COVID-19 test. Defendants did not perform an interactive dialogue with Mr. Mattila prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

COMPLAINT

5

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

13. Plaintiff Steven Ericson, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Ericson was granted a religious exemption but was denied an accommodation and resigned under duress when his disability expired, as he was told he would be terminated upon medical release to work. Defendants did not perform an interactive dialogue with Mr. Ericson before the decision was made to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, on or about February 6, 2023, Plaintiff Ericson was hired by Central Pierce Fire & Rescue and was fully accommodated with a religious exemption.

14. Plaintiff Darrin Quaschnik, an individual, is a Firefighter, who was on disability at the time the mandate took effect and was not terminated. However, Mr. Quaschnik was continuously threatened with termination and was told he would be terminated upon the expiration of his disability leave, despite the fact that the failure of the vaccine became very well known, and despite never holding an interactive dialogue with Mr. Quaschnik prior to making the decision that he would be terminated.  Defendants caused Mr. Quaschnik extreme anxiety and stress.

15. Plaintiff Wayne Johnson, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Johnson was granted a religious exemption but was denied an accommodation and retired under duress on or about October 16, 2021. Defendants did not perform an interactive dialogue with Mr. Johnson prior to making the decision to terminate and identified no

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

undue hardship the Department would have suffered if an accommodation had been provided.

16.   Plaintiff Ian Condon, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Condon was granted a religious exemption but was denied an accommodation and was terminated on or about November 18, 2021. Defendants did not perform an interactive dialogue with Mr. Condon prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

17.   Plaintiff Joshua Gibbs, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Gibbs was granted a religious exemption but was denied an accommodation and was terminated on or about December 21, 2021. Mr. Gibbs also had demonstrated and documented natural immunity through a positive COVID-19 antibody test. Defendants did not perform an interactive dialogue with Mr. Gibbs prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

18.   Plaintiff Jason Overstreet, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Overstreet was granted a religious exemption but was denied an accommodation and was terminated on or about December 12, 2021. Defendants did not perform an interactive dialogue with Mr. Overstreet prior to making the decision to

ARNOLD & JACOBOWITZ PPLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, on or about May 1, 2023, Plaintiff Overstreet was hired by Central Pierce Fire & Rescue and was fully accommodated with a religious exemption.

19. Plaintiff Kenneth Whitehair, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Whitehair did not file for an exemption but exercised his rights to privacy and was terminated in violation of his rights to due process, bodily autonomy, breach of contract, and privacy. Mr. Whitehair was terminated on or about November 11, 2021. Mr. Whitehair also had demonstrated and documented natural immunity through a positive COVID-19 and/or antibody test.

20. Plaintiff Lance Fisher, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Fisher was granted a religious exemption but was denied an accommodation and retired under duress on or about March 1, 2022. Mr. Fisher also had demonstrated and documented natural immunity through a positive COVID-19 and antibody tests. Defendants did not perform an interactive dialogue with Mr. Fisher prior to the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Plaintiff Fisher applied for reinstatement under the Public Safety Civil Service Commission (PSCSC) rules and was approved for reinstatement by the Commission on March 21, 2023, and was reinstated by the Department on July 5, 2023.

COMPLAINT                                         8                **ARNOLD & JACOBOWITZ PPLC**
                                                                  8201 164th Avenue NE, Suite 200
                                                                  Redmond, WA 98052
                                                                  (206) 799-4221

21.  Plaintiff Andrew Stewart, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Stewart was granted a religious exemption but was denied an accommodation and was terminated on or about August 18, 2022. Mr. Stewart also had demonstrated and documented natural immunity through a positive COVID-19 and antibody test. Defendants did not perform an interactive dialogue with Mr. Stewart prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, Plaintiff Stewart was hired by Central Pierce Fire & Rescue and was fully accommodated with a religious exemption.

22.  Plaintiff Theresa Macmillan, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Ms. Macmillan was granted a religious exemption but was denied an accommodation and retired under duress on or about January 1, 2022. Defendants did not perform an interactive dialogue with Ms. Macmillan prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

23.  Plaintiff Ann-Maree Tedaldi, an individual, was an employee, formerly with the City of Seattle Fire Department, who during employment with the Department was a resident of Washington State. Ms. Tedaldi was granted a religious and medical exemptions but was denied an accommodation and was terminated on or about April 5, 2022. Ms. Tedaldi also had demonstrated and documented natural immunity through a positive COVID-19

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

test. Defendants did not perform an interactive dialogue with Ms. Tedaldi prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Ms. Tedaldi teleworked exclusively during the pandemic and performed even a majority of her work remotely prior to the pandemic. On or about January 9, 2023, Plaintiff Tedaldi was hired by West Texas Rehabilitation Centers and was fully accommodated with an exemption.

24.     Plaintiff Robert Kilcup, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Kilcup was granted a religious exemption but was denied an accommodation and was terminated on or about October 18, 2021. Defendants did not perform an interactive dialogue with Mr. Kilcup prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

25.     Plaintiff Joseph Toche, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Toche was granted a religious exemption but was denied an accommodation and was terminated on or about January 7, 2022. Defendants did not perform an interactive dialogue with Mr. Toche prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

26.     Plaintiff Joseph Hickey, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr.

Hickey was granted a religious exemption but was denied an accommodation and retired under duress on or about October 18, 2021. Defendants did not perform an interactive dialogue with Mr. Hickey prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

27. Plaintiff Joshua Schaapveld, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Schaapveld was granted a religious exemption but was denied an accommodation and was terminated on or about August 1, 2022. Defendants did not perform an interactive dialogue with Mr. Schaapveld prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

28. Plaintiff James O'Connell, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. O'Connell was granted a religious exemption but was denied an accommodation and was terminated on or about February 28, 2022. Defendants did not perform an interactive dialogue with Mr. O'Connell prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

29. Plaintiff Andrew Pittman, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Pittman was granted a religious exemption but was denied an accommodation and was

COMPLAINT                                    11                    **ARNOLD & JACOBOWITZ PPLC**

terminated on or about November 9, 2021. Defendants did not perform an interactive dialogue with Mr. Pittman prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, Plaintiff Pittman volunteered with Port Angeles Fire Department, fully accommodated with a religious exemption, and was eventually hired full time by Key Peninsula Fire Department with no consideration whether he was vaccinated or not.

30.   Plaintiff Peter Denton, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Denton was granted a religious exemption but was denied an accommodation and was terminated on or about November 23, 2021. Defendants did not perform an interactive dialogue with Mr. Denton prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, on or about August 17, 2022, Plaintiff Denton was hired by Charlotte County Fire & EMS, Florida, with no requirement for COVID-19 vaccine.

31.   Plaintiff Dennis Stanley, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Stanley was granted a religious exemption but was denied an accommodation and was terminated on or about November 12, 2021. Defendants did not perform an interactive dialogue with Mr. Stanley prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, on or about February 20, 2023, Plaintiff Stanley was hired by

COMPLAINT                                          12                    **ARNOLD & JACOBOWITZ PPLC**

Hardin County Fire Department, with no requirement for COVID-19 vaccine and no need for an accommodation.

32.   Plaintiff Brian Paterik, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Paterik was granted a religious exemption but was denied an accommodation and retired under duress on or about January 1, 2022. Defendants did not perform an interactive dialogue with Mr. Paterik prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

33.   Plaintiff Michael Todd, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Todd was granted a religious exemption but was denied an accommodation and retired under duress on or about May 1, 2023, while still on disability, being continuously told he would be terminated upon expiration of his disability. Defendants did not perform an interactive dialogue with Mr. Todd prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

34.   Plaintiff Mark Nelson, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Nelson was denied a religious exemption and retired under duress after being released from disability on or about May 1, 2023. Mr. Nelson also had demonstrated and documented natural immunity through a positive COVID test. Defendants did not

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

perform an interactive dialogue with Mr. Nelson prior to making the decision to deny his religious exemption and terminate him upon release from disability. Defendants identified no undue hardship the Department would have suffered if his exemption had been granted and an accommodation had been provided.

35. Plaintiff Tom Newman, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Newman was granted a religious exemption but was denied an accommodation and retired under duress on or about October 17, 2021. Defendants did not perform an interactive dialogue with Mr. Newman prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

36. Plaintiff Eric Sadlon, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Sadlon was granted a religious exemption but was denied an accommodation and was terminated on or about March 6, 2022. Defendants did not perform an interactive dialogue with Mr. Sadlon prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Following termination by Defendants without accommodation, Mr. Sadlon was granted a full accommodation with Lewis County Fire District No. 13 in Curtis, WA, to respond to 911 calls and provide patient care, and currently works for Albermarle County Fire and Rescue in Albemarle County, Virginia, with no vaccine mandate.

COMPLAINT                                    14                        **ARNOLD & JACOBOWITZ PPLC**

37. Plaintiff Zero Iaulualo, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Iaulualo was granted a religious exemption but was denied an accommodation and was terminated on or about November 12, 2021. Mr. Iaulualo also had demonstrated and documented natural immunity through a positive COVID-19 test. Defendants did not perform an interactive dialogue with Mr. Iaulualo prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, Plaintiff Iaulualo volunteered with North Whidbey Island Fire Department, unvaccinated, fully accommodated, and was then hired by Kootenai County Fire Department in Idaho with no requirement for COVID-19 vaccine and no need for an accommodation.

38. Plaintiff Eric Gochnour, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Gochnour was granted a religious exemption but was denied an accommodation and was terminated on or about November 17, 2021. Mr. Gochnour also had demonstrated and documented natural immunity through a positive antibody test. Defendants did not perform an interactive dialogue with Mr. Gochnour prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided. Subsequently, Plaintiff Gochnour was hired fully accommodated as the Training Captain for Boeing Fire Department and will be assigned to their Seattle facility.

COMPLAINT                                          15                    **ARNOLD & JACOBOWITZ PPLC**

39.   Plaintiff David Dahlin II, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Dahlin was granted a religious exemption but was denied an accommodation and was terminated on or about November 22, 2021. Mr. Dahlin also had demonstrated and documented natural immunity through a positive COVID-19 test. Defendants did not perform an interactive dialogue with Mr. Dahlin prior to making the decision to terminate and identified no undue hardship the Department would have suffered if an accommodation had been provided.

40.   Plaintiff Emmanuel Hearne, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Hearne was terminated on or about October 18, 2021. Mr. Hearne exercised his right to privacy and did not submit an exemption but was terminated in violation of due process, contract and privacy rights. Mr. Hearne also had demonstrated and documented natural immunity through a positive COVID-19 test. Subsequently, on or about January 8, 2023, Plaintiff Hearne was hired by Idaho State Police with no requirement for COVID-19 vaccine and no need for an accommodation.

41.   Plaintiff Michael Peterson, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Peterson was denied a religious exemption and was terminated on or about November 11, 2021. Defendants did not perform an interactive dialogue with Mr. Peterson prior to the decision to terminate him and identified no undue hardship the

ARNOLD & JACOBOWITZ PPLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

Department would have suffered if his exemption had been granted and an accommodation had been provided.

42. Jesse Gorham, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Gorham was granted a religious exemption but was denied an accommodation. Mr. Gorham was threatened with termination once released from his current extended medical disability leave, causing great anxiety and stress. Mr. Gorham also had demonstrated and documented natural immunity through a positive COVID-19 test. Defendants did not perform an interactive dialogue with Mr. Gorham prior to the decision to terminate him and identified no undue hardship the Department would have suffered if an accommodation had been provided.

43. Branon Snyder, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State. Mr. Snyder was denied a religious exemption and is currently on long-term disability leave. Because of the discriminatory culture at SFD, Mr. Snyder is forced to retire, with a retirement date set for July 1, 2023. Mr. Snyder also had demonstrated and documented natural immunity through a test. Defendants did not perform an interactive dialogue with Mr. Snyder prior to the decision to terminate him and identified no undue hardship the Department would have suffered if his exemption had been granted and an accommodation had been provided.

44. Else Hiemstra, an individual, is a Firefighter, formerly with the City of Seattle, who during employment with the Department was a resident of Washington State.   Ms.

COMPLAINT                                    17                    **ARNOLD & JACOBOWITZ PPLC**
                                                                  8201 164th Avenue NE, Suite 200
                                                                  Redmond, WA 98052
                                                                  (206) 799-4221

Hiemstra exercised her rights to privacy and bodily autonomy and refused the vaccination, at which time she was told she would be terminated. Forced to make the unspeakable decision of violating her bodily autonomy or keeping her job, Ms. Hiemstra took one shot but was "completely disgusted with myself," at which time she used all of her sick leave and was forced to retire absent the second shot on April 15, 2022. She never returned to work after being told she would be terminated because she was not fully vaccinated.

45.    All Plaintiffs have filed tort claims against the City and sixty calendar days have elapsed since the claims were first presented. Wash. Rev. Code § 4.92.110, § 4.96.020(4).

## I.    JURISDICTION AND VENUE

46.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

47.    Venue is proper in this Court under 28 U.S.C. § 1391 where the Department is headquartered within this District and Defendants reside therein.

48.    In compliance with Wash. Rev. Code § 4.92.100, Plaintiffs have submitted Tort Claims against the City of Seattle; sixty days have passed since that submission, during which all statutes of limitations were tolled pursuant to Wash. Rev. Code § 4.92.110, § 4.96.020(4).

## II.    FACTS

The Parties:

49.    Plaintiffs were employees of the City of Seattle and the Seattle Fire Department until they were wrongfully terminated, forced to resign or retire with threats of loss of benefits,

COMPLAINT                                          18                    **ARNOLD & JACOBOWITZ PPLC**
                                                                        8201 164th Avenue NE, Suite 200
                                                                        Redmond, WA 98052
                                                                        (206) 799-4221

or were placed on disability with reminders that they would be terminated immediately upon removal from disability status.[1]

50.   Defendants each made the decisions to terminate Plaintiffs without accommodation and refused to engage Plaintiffs in a legally required interactive dialogue to discuss accommodations that would have kept Plaintiffs employed.

51.   Defendants each refused to identify an undue hardship that they would have suffered had SFD accommodated Plaintiffs, but instead created hypothetical risks that are not permissible under the law.

52.   Defendants each created and implemented a *per se* rule that no accommodations would be allowed and that no discussion was permitted on this point.

53.   To the extent a process existed, each Defendant was intimately involved through denying any meaningful dialogue with Plaintiffs, making excuses with rhetoric denying accommodation, signing termination letters enforcing the wrongful termination of Plaintiffs, misapplying the requirements of the Proclamation, and creating their own mandate within a mandate that violated Plaintiffs' civil rights.

---

[1] Plaintiff Steve Collins, Brian Paterik, Theresa MacMillan, Joseph Hickey, Mark Nelson, Tom Newman, Wayne Johnson, Lance Fisher, Else Hiemstra, and Michael Todd retired prematurely under duress due to threats of termination with loss of retirement benefits. Plaintiff Andrew Barber resigned under duress. Plaintiff Brent Mattila was on disability at the time the mandate took effect and was terminated upon release from disability on or about December 8, 2022. Plaintiff Joe Toche was terminated January 2022. Eric Sadlon was terminated September 6, 2022. Jeffery Vale was terminated May 31, 2022. Plaintiffs Darrin Quaschnik, and Steve Ericson were also on disability at the time the mandate took effect. Mr. Ericson knew he would be terminated upon release from disability and mitigating his losses, he was offered and accepted a position with Central Pierce Fire and Rescue as a fully accommodated firefighter, only to have Defendants thereafter claim Mr. Ericson could return after the mandate was dropped. Mr. Quaschnik was likewise on disability and threatened with certain termination upon release, but remained on disability until after the mandate was rescinded. Plaintiff John Cizin is the only firefighter who was terminated while he was on disability. *See Tandon v. Newsom,* 141 S. Ct. 1294, 1297 (2021) (per curiam) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63, 68 (2020) (litigants are entitled to relief where they "'remain under a constant threat' that government officials will use their power" to enforce the law against them.)).

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

54. Beginning on or about August 2021, Plaintiffs began applying for religious exemptions from the Department's new employee vaccination requirement.[2]

55. For each Plaintiff, Defendants determined the Plaintiffs had a sincerely held religious belief that prevented the taking of the vaccination.[3]

56. Defendants' exemptions were not exemptions at all, but instead were a means to appear in compliance with Title VII of the Civil Rights Act and the Washington Law Against Discrimination (WLAD) while simultaneously singling out those employees in order to publicly shame them in front of their peers due to their sincerely held religious beliefs and in order to segregate them from secular compliers.

57. Plaintiffs were each denied accommodation.[4]

---

[2] Plaintiffs Kenneth Whitehair, Emmanuel Hearne, Else Hiemestra, and John Cizin each exercised their right to privacy and declined to provide proof of their vaccination. Each were terminated or forced to retire or resign under duress in violation of their rights to autonomous decision-making, due process, breach of their employment contract, and violation of the "takings clause" of the U.S. and Washington State constitutions, *infra*.

[3] *See* n.2, for those plaintiffs who exercised their right to privacy and did not file a religious exemption request. Also, Plaintiffs Andrew Young, Branon Snyder, and Mark Nelson each submitted religious exemptions but were denied outright. *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007) (holding that one need not "show that his beliefs are central to a mainstream religion."). "United's bizarre inquisition into the sincerity of its employees' beliefs is somewhat at odds with our usual approach of taking parties at their word regarding their own religious convictions." *Cf. Whole Woman's Health v. Smith,* 896 F.3d 362, 371 (5th Cir. 2018) (quoting *Moussazadeh v. Tx. Dep't. of Criminal Justice,* 703 F.3d 781, 791 (5th Cir. 2021) (recognizing courts take a "light touch" when it comes to examining religious belief and practice); *see also Tagore v. United States,* 735 F.3d 324, 328 (5th Cir. 2013), in which the Court stated, "[C]laims of sincere religious belief in particular practice have been accepted on little more than the plaintiff's credible assertions." Likewise, the Supreme Court has held that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) (quotations omitted).

[4] *See* n.2 and n.3, for those who exercised rights to privacy and did not file a request for exemption, and those denied a religious exemption outright and never reached the accommodation stage.  Additionally, documents received pursuant to a PRA request, Wash. Rev. Code 42.56, revealed that an additional 32 firefighters were granted a religious exemption, denied an accommodation, and then took the vaccine in order to avoid termination, loss of income, pension, and medical benefits. Exhibit A.  An additional two employees received a medical exemption, but likewise denied accommodation and took the vaccine to save their livelihoods. *Id.*

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

58.  For each Plaintiff, Defendants relied on job descriptions in lieu of personal dialogue in denying accommodation, a global accommodation denial that did not entail an interactive dialogue with each Plaintiff before the decision to terminate had already been made.

59.  For each Plaintiff, after submitting a request for a religious exemption, most Plaintiffs received the same form letter stating that their exemption was approved, but accommodation was denied. There was no dialogue or interaction between the Parties after a request for an exemption was submitted but before an accommodation was denied.

60.  For each Plaintiff, Defendants did not identify the undue burden they would have suffered had they accommodated Plaintiff.

61.  Each Plaintiff was told that there were no accommodations absent full vaccination.

COVID-19 Vaccines:

62.  During 2020, several experimental vaccines were developed to limit the effects of COVID-19.[5]

63.  By early to mid- 2021, it had become clear that the COVID-19 vaccines developed by Pfizer, Moderna and Johnson & Johnson did not prevent recipients from being infected with, or spreading, COVID-19.

64.  Thus, unlike polio or smallpox vaccines, the COVID-19 vaccines did not eliminate infection and could not end transmission of the virus.

65.  Many studies confirmed this fact, including studies from the Centers for Disease Control and Prevention (CDC), upon which Defendants allegedly relied.

---

[5] The effects of COVID-19 are also in dispute. The most reputable study by John Ioannidis of Stanford who reports that for those less than 70 years old the median infection fatality rate was 0.05%. This was published in the Bulletin of the World Health Organization in 2021. Exhibit B.

COMPLAINT                                21                    **ARNOLD & JACOBOWITZ PPLC**
                                                               8201 164th Avenue NE, Suite 200
                                                               Redmond, WA 98052
                                                               (206) 799-4221

66.    The single benefit of the COVID-19 vaccine, as even the government admits, is to protect an infected, vaccinated person from severe illness or death, but even that benefit is disputed, and wanes over time to the extent it exists at all.

67.    Moreover, under 21 U.S.C. § 360bbb-3, the Secretary of Health and Human Services "may authorize the introduction … of a drug, device, or biological product intended for use in an actual or potential emergency" before such products receive full FDA approval. Such Emergency Use Authorizations (EUAs) are subject to strict requirements, including that "individuals to whom the product is administered are informed ... of the **option to accept or refuse administration of the product**." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) (emphasis added).

68.    The FDA has interpreted this provision of the EUA statute to mean that "[r]ecipients **must have an opportunity to accept or refuse the EUA product** and must be informed of any consequences of refusing administration of the product" and that this right to refuse can only be waived if the President makes a specific determination in writing, and only with respect to members of the armed forces.

69.    When Congress adopted the statute, it interpreted it in the same way, explaining it as "the *right*…to refuse administration of a product."[6]

---

[6] H.R. Conf. Rep. No. 108-354, at 782 (2003) (emphasis added). This concern was published in August 2020 on the Centers for Disease Control (CDC) transcript of a meeting of the Advisory Committee on Immunizations and Respiratory Diseases, at which Dr. Amanda Cohn stated (@ 1:14:40), "I just want to add that, just wanted to remind everybody, that **under an Emergency Use Authorization, an EUA, vaccines are not allowed to be mandatory.** So, early in the vaccination phase, individuals will have to be consented and they won't be able to be mandated." (emphasis added). The only COVID-19 drugs made available to Plaintiff are classified by the FDA as investigational new drugs. No FDA-licensed COVID-19 vaccines have been introduced into commerce for general marketing since the declaration of the pandemic in March 2020 through the filing of this Complaint. *See* 86 Fed. Reg. 5200, Jan. 19, 2021 (Pfizer); 86 Fed. Reg. 5211, Jan. 19, 2021 (Moderna); and 86 Fed. Red. 28608, May 27, 2021 (J&J).

COMPLAINT                                            22                        **ARNOLD & JACOBOWITZ PPLC**

70. Defendants demanded Plaintiffs take this experimental shot authorized as emergency use only, in violation of numerous federal laws, and fully understanding that the shot did not prevent the spread of the virus.

71. Plaintiffs were told by Defendants that their "current job type has essential duties that occur indoors or outdoors that *may* require unavoidable or unpredictable interaction and or exposure to others, including non-employees, who *may* be ineligible for vaccination or whose vaccination status may be unknown." Exhibit C (emphasis added).

72. Defendants' denial letters all included the same verbiage, utilizing the same speculative harm, without engaging in a dialogue with the Plaintiffs or identifying any burden they would suffer if accommodations were granted.

73. In fact, Defendants identified no accommodations other than compliance with the vaccine mandate, rendering the grant of a religious exemption meaningless.

74. Defendants did not identify what that significant risk of harm was.

75. Defendants provided no means of eliminating the risk absent full vaccination.

The Proclamation:

76. On August 9, 2021, Governor Inslee issued Proclamation 21-14 (with amendments 21-14.1 on August 20, 2021, and 21-14.2 on September 27, 2021, the "Proclamation").

77. The Proclamation provided that "State agencies…***must*** provide any disability-related reasonable accommodations and sincerely held religious belief accommodations to the requirements of this Order that are required under the American with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (Rehabilitation Act), Title VII of the Civil

Rights act of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), and any other applicable law." Exhibit D (Proclamation 21-14 *et seq.*) (emphasis added).

78. Coinciding with the Governor's announcement of Proclamation 21-14.1, Defendant Mayor Jenny Durkan issued Mayoral Directive #9, on August 9, 2021, which required all city employees to be fully vaccinated as a condition of employment before October 18, 2021. The stated purpose of Defendant's mandate was "to reduce the spread of COVID-19 in our communities," Exhibit E.

79. Defendant Durkan stated in a memo announcing the vaccine mandate to City employees, dated August 9, 2021, that "s[s]tarting Monday, October 18, 2021," those "who had applied and are verified to have a medical or religious exemption will be required to undergo COVID-19 testing weekly and be required to distance." *Id.*[7] The City of Seattle likewise authorized testing and distancing as an accommodation to those who had an exemption to the vaccine. *Id.*

80. This announcement came just four days after the CDC announced that the vaccine did not prevent transmission,[8] which Defendant Durkan was certainly aware of and influenced her statement that accommodations would be provided for religious and medically exempt employees.

81. However, despite making that statement on August 9, 2021, coinciding with the CDC announcement on August 5, 2021, that the vaccine did not stop transmission, Defendant

---

[7] *See also* https://durkan.seattle.gov/2021/08/to-combat-the-spread-of-the-delta-variant-mayor-jenny-durkan-announces-vaccine-requirement-for-city-employees/ (last accessed on July 19, 2023), the City of Seattle web page announcing the mandate but identifying the accommodations for the vaccine.
[8] https://www.stardem.com/news/national/cdc-covid-vaccines-won-t-stop-transmission-fully-vaccinated-can-still-get-spread-delta-strain/article_5f83d0cb-8b0a-535d-bbad-3f571754e5ae.html (last accessed on July 19, 2023).

COMPLAINT                                              24                    **ARNOLD & JACOBOWITZ PPLC**
                                                                           8201 164th Avenue NE, Suite 200
                                                                           Redmond, WA 98052
                                                                           (206) 799-4221

Durkan thereafter universally denied accommodation to all Plaintiffs, essentially rescinding an accommodation that she had previously granted.[9]

82. Defendants did not follow their own guidance or policy with respect to Plaintiffs, who were all found to have a sincerely held religious belief.

83. Defendants stated it would be a two-step process to decide first if there was an exemption, and second, if that exemption could be accommodated after an interactive dialogue with Plaintiff. Defendants combined their process into one step, reviewed a job description, declared the employee posed a threat, and skipped the interactive dialogue.

84. This defied the terms of the Proclamation SFD supported, which required an interactive dialogue in accordance with Title VII, ADA and WLAD. SFD created their own "mandate within a mandate" in a rogue attempt to discriminate against religious objectors and denied that which the Proclamation demanded.

85. Defendants ignored the terms of the Proclamation, while simultaneously ignoring the guidance provided by OFM detailing accommodation suggestions and implementing the Proclamation.

86. Ironically, Defendants proceeded at warp speed to terminate Plaintiffs for alleged failure to comply with the Mandate, while Defendants themselves were failing to comply with the Mandate.

87. Defendants also admitted that medical exemptions would be accommodated, but religious would not. But even that turned out to be not true when the individual also

---

[9] In a May 31, 2020, statement released to all city employees, Mayor Durkan, commenting on the riots across the City and nation, blamed these demonstrations on "white men." "I also want to acknowledge that much of the violence and destruction, both here in Seattle and across the country, has been instigated and perpetuated by white men. Exhibit F. All but a few of the Plaintiffs are Caucasian.

COMPLAINT

25

applied for a religious exemption.  Both Plaintiffs Vale and Tedaldi each applied for and were granted religious and medical exemptions and both were denied accommodations for their sincerely held religious belief and their medical disability.

88.  Under the Washington Law Against Discrimination, Wash. Rev. Code. 49.60 (WLAD), any employer's restrictions of employees' constitutional rights must be narrowly tailored to further a compelling government interest.

89.  Defendants did not hold any interactive dialogue to find a reasonable accommodation.

90.  Defendants did not narrowly tailor the restriction to further its interest in containing the spread of the virus because they did not consider any accommodation other than vaccination.

91.  Defendants did not identify an undue hardship they would have suffered had they accommodated Plaintiffs, in accordance with precedent *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977), and reaffirmed and revisited in *Groff v. DeJoy,* No. 22-174 (June 29, 2023) (holding that *TransWorld Airlines* requires not just a *de minimis* burden, but employer must show "that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business", *Groff* at *1-2).

92.  Defendants did not identify any hardship, much less one that would "result in substantial increased costs in relation to the conduct of its particular business." *Id.*

93.  The *Hardison* standard requires a "net analysis" to analyze the hardship relative to the impact it would also have on Defendants' business.  Defendants' actions in terminating

COMPLAINT                                    26                    **ARNOLD & JACOBOWITZ PPLC**
                                                                  8201 164th Avenue NE, Suite 200
                                                                         Redmond, WA 98052
                                                                           (206) 799-4221

Plaintiffs had a catastrophic financial impact on the City of Seattle and the services it is duty-bound to provide to its citizens.

94.  Defendants specifically stated that the reason no accommodations were provided was because any accommodation would pose a "financial hardship," without any analysis or cost projections.

95.  Defendants failure to even discuss a hardship does not satisfy the *de minimis* standard, much less establishing that any accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Id.* Defendants have paid tens of millions of dollars in overtime pay due to massive staff shortages, creating a greater hardship than would have been hypothetically created by an accommodation granted, discussed *infra*.

96.  Defendants did not consider other alternatives to full vaccination, such as personal protective equipment (PPE), distancing, testing, or other strategies used by a majority of the fire departments across the state that fully accommodated firefighters without termination, *infra,* especially given the failure of the vaccine to stop the spread or reinfection of those who were vaccinated.

97.  Defendants did not narrowly tailor their restrictions to Plaintiffs' constitutional rights given that Defendants required nothing short of violating their constitutional rights.

98.  Defendants were advised in a September 20, 2021, email from Kelly M. Woodward, State Human Resources Interim Deputy Assistant Director, Office of Financial Management (OFM), that "[a]gencies are advised to consider combinations of accommodations in determining if an accommodation can be granted, and to do so in

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

1    consultation with legal counsel….” Exhibit G; *see also* Exhibit H, at 17-18, and Exhibit

2    I, at 17.

3    99.    It is unknown the extent, if any, to which Defendants consulted legal counsel.

4    100.   Based on information and belief, many firefighters at SFD utilized fraudulent vaccine

5            cards, which Defendants are aware of, and thus kept their jobs.

6    101.   Based on information and belief, these were not religious or medical objectors, but were

7            those who simply did not believe in the efficacy of the vaccine and were aware of adverse

8            effects.[10]

9    102.   The cards were offered by members that were part of the vaccine administration team,

10           and this activity was made known to Defendants, who did not conduct any investigation

11           or take any action to stop the activity by these secular employees.

12   103.   This further evidences the discriminatory nature of Defendants' actions and that they

13           were not motivated by safety.

14   Breakthrough cases of COVID-19 in the fully vaccinated:

15

16

17

18

19   ────────────────────────

        [10] When Governor Inslee issued his Covid-19 vaccine mandate, the VAERS data for the Covid-19 vaccine
20   shots showed over a hundred thousand vaccine-related deaths or hospitalizations, as well as thousands of heart
     attacks, myocarditis and pericarditis episodes, permanent disability in the tens of thousands and other life-
     threatening episodes. https://openvaers.com/covid-data. *See also* https://vaersanalysis.info/2022/01/14/vaers-
21   summary-for-covid-19-vaccines-through-01-07-2022/ (last accessed on July 19, 2023). The VAERS system suffers
     from gross underreporting by between 5 and 10 times and as-high-as 40 times. Center for Disease Control and
     Prevention Morbidity and Mortality Weekly Report, COVID-19 Vaccine Safety in Children Aged 5–11 Years —
22   United States, November 3–December 19, 2021 (CDC admits that VAERS under-reports by 4.5 times) (December
     22, 2021); Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS), a
23   Harvard Pilgrim Study (2010) (Stated that less than 1% of the adverse events were reported in the VAERS system.).

104. These vaccines were developed quickly to protect those who were at highest risk of getting seriously ill from COVID-19, especially the elderly and those with multiple co-morbidities.[11]

105. Pfizer officials have admitted that its vaccine was not tested for efficacy at preventing transmission or infection, and the Food and Drug Administration likewise admitted that the vaccines were not licensed or authorized for prevention of infection or transmission, nor were clinical trials designed for such.[12]

106. It is now universally admitted that the vaccinated can contract and transmit COVID-19.

107. Defendants provided no method of meeting their interest in virus containment other than vaccination, notwithstanding the fact that the vaccine did not prevent infection or the spread of the virus, and Defendants had knowledge of this fact.

108. A statement from CDC Director Rochelle P. Walensky, MD, MPH, was issued and publicly available on the CDC website on July 30, 2021, before Washington Governor Jay Inslee's Proclamation 21-14 *et seq.,* that stated, "…data were published in CDC's Morbidity and Mortality Weekly Report (MMWR) demonstrating that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern

---

[11] Finding most deaths for COVID-19 occurred in nursing homes, and that the inferred median infection fatality rate in locations with a COVID-19 mortality rate lower than the global average is low (0.09%). "If one could sample equally from all locations globally, the median infection fatality rate might even be substantially lower than the 0.23% observed in my analysis." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7947934/pdf/BLT.20.265892.pdf/ (last accessed on July 19, 2023).

[12] Dr. Peter Marks, Director, Center for Biologics Evaluation and Research with the Food and Drug Administration, stated, "The vaccines are not licensed or authorized for prevention of infection with the SARS-CoV-2 virus or for prevention of transmission of the virus, nor were the clinical trials supporting the approvals and authorizations designed to assess whether the vaccines prevent infection or transmission of the virus." Exhibit J, at 12.  Available at: https://www.regulations.gov/document/FDA-2023-P-0360-0191 (last accessed on July 19, 2023).

that, unlike with other variants, **vaccinated people infected with Delta can transmit the virus."**

109.  Recorded "breakthrough" cases (fully vaccinated individuals contracting COVID-19) in Washington State from July 17, 2021, to July 9, 2022, alone totaled 636,766, with a majority of these breakthrough cases in the 20-49 years age group (74 percent). Exhibit K. These cases do not represent infection in the typical vulnerable population.

110.  The CDC also released a complete report of rising breakthrough cases in a report dated August 13, 2021, Exhibit L, which was also recognized by the Washington State Department of Health (DOH) in a news release recognizing extensive breakthrough cases recognized as early on March 29, 2021. *Id.* at 8.

111.  The same report quoted a study from the Ministry of Health in Israel stating that there were higher breakthrough rates and lower vaccine efficacy against infection for persons vaccinated in the first two months of 2021, well before the termination date of Plaintiffs. *Id.* at 18.

112.  These findings were also supported by retrospective cohort studies of vaccinated persons with Pfizer in large health care systems, also cited by the CDC, which concluded that there was a 2.3-fold increased risk for breakthrough infection among persons vaccinated during that same period, and a higher breakthrough infection rate among those who received a second dose within a certain period. *Id.*

113.  The CDC report, *id.*, noted "increased transmission," but also "potential reduced antibody efficacy, and that, with respect to the Delta variant, "[f]ully vaccinated people with Delta breakthrough infections can spread virus to others." *Id.* at 15.

COMPLAINT                                   30                    **ARNOLD & JACOBOWITZ PPLC**

114. On September 27, 2021, a Joint Safety Committee (JCS) Meeting between Labor and Management at SFD discussed the policy of SFD, stating: "Current policy is to follow CDC guidelines…." Exhibit M.

115. Meeting minutes from a Labor/Management JCS Meeting of November 30, 2021, recognized that "we need to have further discussion, and look at the effectiveness of the vaccine with the [Omicron] variant," Exhibit N, a discussion Plaintiffs attempted to initiate *before* they were terminated.

116. Internal memos show SFD had actual knowledge of breakthrough cases before terminating the Plaintiffs.

117. For example, as evidenced by a PRA document produced by Defendants, which provides member tracking of vaccinated firefighters who tested positive for COVID-19 despite vaccination, it demonstrates that in 2022 alone there were just under 200 positive COVID-19 tests of fully vaccinated firefighters who had to remain in quarantine or isolation due to their breakthrough infection of COVID-19. Exhibit O.

118. Many of the Plaintiffs also had personal knowledge of co-workers who had been vaccinated and who reinfected with COVID-19 prior to termination. Plaintiffs brought this to the attention of Defendants but were silenced.

119. In fact, "[i]n November and December 2021, despite the termination of all unvaccinated Firefighters, the Department had a severe outbreak of COVID-19 among its fully vaccinated members…." Exhibit P, at 2.  This prompted the Department to implement on December 17, 2021 "the exact accommodations suggested by the religious objectors

ARNOLD & JACOBOWITZ PPLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

(e.g., masking, daily testing, isolation and social distancing) … in Memo 155-21." *Id.* at 8-9.

120. Defendants denied as too expensive the very protocol they were using for secular firefighters.

121. Adverse reactions to the shot were also well known and concerning.[13] Plaintiffs were aware that Capt. Sean Galt had a stroke that Capt. Galt openly discussed and attributed to the vaccine.

122. In fact, Plaintiff John Cizin met with Capt. Galt at Fire Station #29 prior to the mandate being announced regarding a safety complaint that Capt. Galt and Jeff Miller, Local 27 Union vice president, were investigating.  At that meeting, which took place at the kitchen table, Mr. Miller openly disclosed weeks long dyspnea post vaccination, that his respiratory work capacity had diminished, and had still been diminished two months post vaccination. Mr. Miller stated he could no longer perform the routine workouts he'd previously done for years at the station.  He attributed the dyspnea to the vaccination. Immediately after Mr. Miller's confession, Capt. Galt then admitted he had a stroke three hours after his vaccination, which required emergency room care and thrombolytics for treatment.  Capt. Galt stated he still had numbness in one of his hands, and he expressed concern he would no longer be able to maintain his commercial driver's license due to his stroke history.

---

[13] *See* Declarations of Dr. Peter McCullough, M.D. and Dr. Michael Jackson, M.D., entered in support of Petition for Injunctive Relief in *Zachary Pilz v. Jay Inslee, et al.,* Case No. 3:21-cv-05735, currently on appeal to the Federal Court of Appeals for the Ninth Circuit, Case No. 22-35508, which addresses extensively the COVID-19 vaccine risks. Exhibits Q, R.

123. Both Mr. Miller and Capt. Gault openly discussed their vaccine history to many Plaintiffs.

124. Plaintiff Cizin was then the first Plaintiff fired for not taking this same injection.

125. Matt Runte, SFD Firefighter of the Year in 2016, had a cardiac arrest within a week of a booster and passed away after he went into cardiac arrest while on a run, requiring CPR by his colleagues.[14] It was known he was vaccinated.

126. Plaintiff David Dahlin's personal situation, in which his mother-in-law had a stroke and his best friend's father died, each event within 48 hours of the shot, caused him and other firefighters great concern. Both of these events occurred prior to termination.

127. Plaintiff Tom Newman's mother suffered an adverse reaction, labeled a cytokine storm, to the Pfizer shot, which led to her death within a year from rapid onset, multiple cancers, which was reported by her doctor in VAERS. The association of the vaccination with rapid onset cancer has been frequently addressed. Exhibits S, T.

128. Mr. Newman's cousin by marriage, as well as friends of his wife, also suffered adverse reactions to the shot.

129. Mr. Newman brought this data to the attention of Defendants but was met with disinterest.

130. Plaintiff Emmanuel Hearne's mother developed severe tinnitus after her initial shots and now has multiple health concerns.  Mr. Hearne's neighbor received two Pfizer shots and

---

[14]https://www.kiro7.com/news/local/seattle-firefighter-dies-suddenly/DWJT3532ORACBPHFME35UL6I2Y/; *see also* https://thenwfireblog.com/2021/12/11/matt-runte-a-celebration-of-life/ and https://twitter.com/seattlefire/status/1471269416683794434?s=42&t=fDNCPScZGuF3owkGTfpm8Q_ (links were last accessed on July 19, 2023).

experienced severe neuropathy, while various people in his church likewise experienced significant adverse effects following vaccination.  Mr. Hearne's wife is in healthcare and has witnessed many patients with serious adverse reactions.  These cases were bought to the attention of Capt. David Berry, who dismissed them and stated they were unfounded.

131.  Capt. Berry also told Mr. Hearne that he would take the shot to keep his job and did not care about the studies.

132.  Plaintiffs have knowledge of one firefighter who only took the vaccination to keep his health insurance for his family but told his family not to take it. Within hours of taking the vaccination, this firefighter was taken to the emergency room for cardiac issues and texted a Plaintiff of his status.

133.  Plaintiffs are aware of numerous other individuals by name who suffered severe adverse reactions following the vaccination, including chest pain, continuous headaches, shingles, cancers, other heart issues, and other long-term complications following vaccination.

134.  Plaintiffs also have the names of at least three vaccinated individuals who died shortly after taking the vaccine.

135.  Multiple members of fire station 25 and one at fire station 22 complained of chest palpitations and other pains while working out.

136.  Nearly every Plaintiff is aware of fully vaccinated firefighters in their respective department who reinfected with COVID-19 prior to Plaintiffs' termination.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

137. Many Plaintiffs are aware of fully vaccinated firefighters in their respective departments or other departments who suffered adverse effects from the vaccination prior to Plaintiffs' termination.

138. Concerned about these adverse effects from the vaccines, which were not only reported nationwide but were apparent just among firefighters, Plaintiff Michael Todd filed an official Safety Complaint with the Health and Safety Office (HSO) following Defendants' protocol for such a complaint per instruction. Exhibit U. The official Complaint was sent to numerous individuals who were tasked to manage and investigate HSO Complaints. *Id.*

139. Any firefighter who has a safety issue can petition the HSO to investigate, with HSO's job to respond to those issues and investigate accordingly. Mr. Todd's Complaint was ignored and he received no feedback.

140. Mr. Todd's Complaint described "the many potentially life-altering and threatening hazards and dangers related to Covid vaccines." *Id.* Mr. Todd stated that the data contained in his Complaint "must become a catalyst for honest scientific exploration and evaluation" by Defendants in the accommodation process. *Id.*

141. Attached to his Complaint was the Affidavit of Army Lieutenant Colonel Theresa Long, M.D., who served as Army Brigade Surgeon for the 1st Aviation Brigade, Ft. Rucker, and had been a Field Surgeon for 10 years, has a Master's Degree in Public Health, and is trained as an Aviation Safety Officer, board certified in Flight Aerospace Medicine, as well as Occupational Medicine. *Id.*

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

142. LTCOL Long's Affidavit notes that there are numerous therapeutic agents that reduce infection, identifies the risk of myocarditis associated with Pfizer and Moderna vaccinations, acknowledges the failure of the vaccine to stop transmission, the low risk of death from COVID-19 infection, and called for a screening program to identify those most at risk from infection. *Id.*

143. Defendants had a duty to ensure Mr. Todd's Complaint was addressed but they did not.

144. Plaintiff Lance Fisher filed a similarly focused grievance with Local 27 on February 24, 2022, bringing attention to the fact that, on February 19, 2022, "it was reported that FDNY Union leadership wants their department to investigate whether three recent FDNY firefighter deaths resulted from city-mandated COVID-19 vaccinations." Mr. Fisher stated that, at the time, SFD "had 2 recent firefighter deaths.  We have also had members who have had cardiac events and strokes since the COVID-19 vaccinations became available to us."  Mr. Fisher concluded, "To protect the safety of the membership I am requesting that Local 27 and/or the Safety Committee under Article 22.1.9 of the contract, conduct an investigation into whether the Covid vaccines had an impact on recent deaths, strokes, and any other adverse medical events suffered by members of the Seattle Fire Department."

145. Mr. Fisher received no response to his grievance from the Union or from Defendants.

146. That Defendants were aware of the risks and inefficacy of the vaccine is without doubt. Data beginning June 29, 2021, identifying the quarantine and isolation status of COVID-positive firefighters at numerous affected locations showed that of 21 individuals in quarantine or isolation status, all but one were fully vaccinated. Exhibit V.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

147. During the Local 27 Regular Business meeting held in September 2021, as well as the All-SFD "Teams" video chat at that same time period, it was stated by Union and Department leadership that of the 11 people in quarantine at that time, at least 9 of them were in fact "fully vaccinated" as defined by the Gubernatorial and Mayoral Mandates. Exhibit W.

148. On October 1, 2021, Plaintiff Jeff Vale notified Defendants Lu and Scoggins regarding statistics in September 2021 alone, when SFD "had 11 covid positive firefighters where we knew the vaccination status. 9 were vaccinated, 2 were unvaccinated." Exhibit X; *see also* Exhibit Y.

149. Plaintiff Vale went on to say that, "[s]o for August and September, I believe that is 21 known covid positive firefighters, 16 are vaccinated, 5 are not.  It appears that forcing unvaccinated firefighters off the job is not going to stop the spread of covid in the department.  I share this because the stated goal of Mayor Durkin for this mandate is to stop the spread of the disease and protect those around us. The vaccine is clearly not doing that." *Id.*

150. Mr. Vale, a terminated Lieutenant with the SFD, used data from the Seattle Fire Exposure Team and Public Records requests.

151. Battalion Chief Scott A. Yurczyk confirmed 10 COVID-positive members in operations in August 2021and two positives in administrative positions, with 7 of the 10 COVID positive operational firefighters fully vaccinated. Exhibit Z.

152. For September, those numbers revealed 15 COVID-positive firefighters, with nine of them being fully vaccinated and four additional with an unknown vaccine status. *Id.*

153. October statistics proved the positive trend that vaccinated firefighters were becoming infected with COVID-19 at nearly twice the rate of the unvaccinated.

154. Defendants ignored Mr. Vale's notice and steadfastly refused any accommodation other than full vaccination, claiming vaccine was "the number one defense" when statistics were showing otherwise.

155. Defendants consistently made broad statements and allowed no ability to address the allegation.  The response was always the same: get vaccinated or you will be fired.

156. For example, Battalion Chiefs visiting fire stations in August 2021 brought data regarding COVID infection and transmission rates among vaccinated and unvaccinated firefighters. The data was apparently being collected to demonstrate the need to wear masks, even if vaccinated, which seemed to miss the crucial consideration that the vaccination was not stopping transmission, masks or no masks. Mr. Cizin discussed this issue with Chief Paul Atwater when he visited Station 29 but he received no answer from the Chief.

157. Defendants relied on emotional rhetoric, sweeping generalizations, and steadfast refusal to discuss, despite the science and the statistics that were being published across the country and were readily available.

158. For example, Dr. Ann Jarris, MD, a medical consultant contracted by the State to provide contract tracing for outbreaks and provide testing regiments for employers, stated, "I'm sorry for not being more political, but I am absolutely through with this. Vaccines are the second greatest public health success since sanitation and the refusal to understand and

COMPLAINT

38

accept the science behind the incredible job the vaccine scientists, makers, distributors, and administrators has [sic] done is nothing short of colossally stupid." Exhibit AA.

159. Defendants stated, "Wow. That is quite the endorsement of vaccination," *id.,* but then in a follow-on discussion to find "a subject matter expert that can focus on why vaccines is [sic] the right path…that is based on science…" *id.,* the City planners agree that Dr. Jarris is the one to "*assist in talking points* for our communications,"  without any recognition that the rhetoric presented by Dr. Jarris was one-sided and did not even consider other scientific studies and/or statistics across the nation.

160. Defendants sought "talking points" and not objective science that did not fit their narrative.

161. In fact, Dr. Jarris presented a simple graph showing that states with higher vaccination rates had lower hospitalization, to which she summarily and simplistically concluded the inverse ratio was due to the vaccination, without an analysis of the factors involved in those statistics.

162. Defendants were interested in supporting their predetermined decision to rigidly require vaccination and terminate religious objectors, not in obtaining objective evidence of the inefficacy of the vaccine, which was known at the time and is now unequivocally proven true.

163. The rhetoric of calling those who did not support COVID-19 vaccination "colossally stupid," *id.*, fueled the discriminatory treatment of those with sincerely held religious objections.

COMPLAINT                                        39                    **ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

164. Defendants then used Dr. Jarris to frame their position on why vaccination was the only way to stay employed, instead of seeking an expert to honestly and transparently discuss the conflicting science at minimum, the catastrophic failure of the vaccine at best.

165. Defendants had a duty to seek medical advice from across the scientific spectrum, not just those who reinforced their position.

166. This should have been part of the interactive dialogue with each Plaintiff that Defendants dismissively shut down.

167. The extent of knowledge of the vaccine's failure to stop transmission was pervasive.

168. For example, on July 16, 2021, King County Public Health staff were notified of a staff party wherein fully vaccinated individuals tested positive for COVID-19 after the staff party. Exhibit AB.

169. Shortly thereafter, Jeffrey Duchin, Chief Communicable Disease Epidemiology and Immunization Section, Public Health for Seattle and King County, and Professor of Medicine, Division of Infectious Diseases, University of Washington, admitted that 37% of new cases of COVID-19 were in vaccinated individuals. Exhibit AC.

170. Dr. Duchin also acknowledged awareness of the well-publicized COVID-19 outbreak in Provincetown, Massachusetts, after a Fourth of July celebration, where according to Steve Katsurinis, chair of the Provincetown Board of Health, 469 cases reported among Massachusetts residents alone, 74 percent were in people who were fully immunized. That number grew to 765 cases overall. Exhibit AD.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

171.  Dr. Duchin was also aware of the famous Israeli study published in early 2021 and quoted by the CDC that acknowledged the failure of the vaccines in Israel in the first two months of 2021, ten months before Defendants terminated Plaintiffs. Exhibit AE.

172.  Dr. Duchin commented on the Israeli study in a social media post, stating on August 27, 2021, "We hear/read a lot about 'breakthrough' infections & the % of people getting hospitalized or dying with CoV-19 that are vaccinated.  But this tells us nothing about what is most important: how the risk changes for vaccinated people compared to unvaccinated people." Exhibit AF.

173.  Dr. Duchin then states on September 3, 2021, "Israeli officials say their data shows that the potency of Pfizer's vaccine wanes over time against severe disease & hospitalization…The FDA wants to see the underlying data, to make sure it backs up summaries that the Israeli government has provided." *Id.*

174.  Dr. Duchin had a duty to not only understand the science available, but to seek out data that might conflict with his narrative.

175.  At a minimum, Defendants, relying almost exclusively on the medical advice of Dr. Duchin and Dr. Michael Sayre, medical director for Seattle Medic One and a physician in the Emergency Department at Harborview Medical Center, as well as Medical Director for the Seattle Fire Department, had a duty to likewise seek out an objective understanding of the science that existed at the time.

176.  Dr. Michael Sayre retweeted Dr. Duchin's post regarding both the Israeli study and the breakthrough cases in the fully vaccinated.  *Id.*

COMPLAINT                                           41                        **ARNOLD & JACOBOWITZ PPLC**
                                                                              8201 164th Avenue NE, Suite 200
                                                                                     Redmond, WA 98052
                                                                                       (206) 799-4221

177. Indeed, just prior to terminating Plaintiffs, the CDC released a report on or about September 10, 2021, regarding a Norwegian Encore cruise ship returning to port in Seattle because of a large outbreak of COVID-19 with approximately 118 cases, despite its 100% vaccinated traveler status of both passengers and crew, as well as negative test prior to boarding. Health officials recognized, "This is crazy. 118 cases. All vaccinated and ALL tested negative prior to embarkation." Exhibit AG.

178. Dr. Duchin was also made aware that deaths were uncommon overall and the number of deaths among cases is low, combined with the high likelihood that many fully vaccinated individuals were not seeking testing due to mild or asymptomatic illness, therefore increasing the proportions of the most severe outcomes. Exhibit AH.

179. Defendants claim to have relied on data and studies from the CDC, DOH, King County Health Department, and the University of Washington, all of whom were publishing studies *prior to* Defendants terminating Plaintiffs regarding the failure of the vaccine to prevent infection and transmission.

180. Defendants continued to simply resort to generalizations that vaccination was "the best defense," when clearly that was at minimum debatable, and at best, an unjustifiable conclusion given that the statistics locally did not support it.  Regardless, Defendants had a duty to engage in a dialogue with Plaintiffs regarding the inconsistency of Defendants' statements.

181. One of those studies that Defendants refused to incorporate into a mindset of "vaccination only" included a study in September 2021, co-authored by both Dr. Sayre, and Dr. Thomas Rea, medical director for King County Medic One, two prominent health care

ARNOLD & JACOBOWITZ PPLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

advisors in the state of Washington, indicating that even among first responders, "we observed a very low overall risk for COVID-19 infection among the EMS first responder workforce attributed to COVID-19 patient encounters…" Exhibit AI.

182. This study co-authored by Dr. Sayre was actually discussed in a ZOOM meeting with approximately seven paramedic firefighters, with questions to Dr. Sayre on why he would co-author a study and then demand vaccination from the very individuals for whom his study concluded had low risk. They received no answer from Dr. Sayre.

183. Even Snohomish County recognized the failure of the vaccine to contain the spread of the virus, stating on July 30, 2021, "The stellar individual protection afforded by vaccination is no longer, nor is the dream of getting out from under COVID on July 1…the vaccine effectiveness is clearly no longer what it was just a couple of months ago and folks should manage themselves accordingly." Exhibit AJ.

184. This calls into question Defendants' narrative that vaccination was the only means available to prevent death, transmission, or contraction of the virus and their steadfast refusal to "manage themselves accordingly." *Id.*

185. Instead, "rates and relative risk provide a clearer picture," Exhibit AH, of virus containment, which Defendants did not consider in its blanket policy that all must be vaccinated.

186. The Defendants knew or should have known that their basis for terminating each of the Plaintiffs – that the Plaintiffs allegedly posed a danger in their unvaccinated state – was a faulty premise given specific knowledge of breakthrough cases and specific knowledge

of low mortality among less vulnerable populations and higher rates of mortality among the vaccinated.

187. Defendants refused to consider the fact that Plaintiffs were at low risk for COVID-19 infection mortality or even hospitalization, a consideration that was never permitted to be incorporated into an accommodation dialogue.

188. The failure of the vaccine negates the narrative that vaccination was needed to prevent deaths, given the misleading statistics regarding the proportion of those testing positive who actually died as a result of infection, especially among healthy populations such as Plaintiffs.

189. Defendants knew at the time Plaintiffs were terminated that the vaccine only provided therapeutic support at best.

190. Thus, at the same time Defendants were aware of breakthrough cases, Defendants continued to demand vaccination as the only way to retain employment and refused to consider any reasonable accommodations to its policy of full vaccination or termination.

Defendants failed to consider the net burden to the agency caused by mass terminations:

191. Defendants refused to bring Plaintiffs back to work, even after Defendants suffered a massive shortage of firefighters, *infra,* caused by vaccinated staff members reinfecting with COVID.

192. In fact, documents produced pursuant to a PRA request showed 88 fully vaccinated "Seattle Firefighters (including lieutenants, paramedics, captains and chiefs) that tested positive for COVID-19 in the month of December 2021, Exhibit AK, while in January 2022, Defendants had "150 uniformed SFD personnel who reported testing positive for

1  CoVID-19 in January 2022 (and six non-uniformed employees). All of them appear to

2  have been vaccinated." Exhibit AL.

3  193.  The same document dated February 9, 2022, received pursuant to a PRA request, found

4  30 additional uniformed personnel who had tested positive in the first nine days of

5  February alone. Ex. AL.

6  194.  A February 2022 staffing matrix showed staffing as low as 165, when full staff is 216.

7  Exhibit AM.

8  195.  As discussed *infra,* Defendants suffered a catastrophic staffing shortage that continues to

9  this day, a self-created "undue hardship" caused by Defendants' failure to balance the

10  net effect of mass termination of religious objectors on the business practice of the

11  Department and the City.

12  196.  Despite this overwhelming data of vaccine failure through breakthrough cases, known

13  prior to termination of Plaintiffs as well as long after Plaintiffs were gone, coupled with

14  catastrophic staffing shortages suffered after Plaintiffs were terminated, *infra,* Plaintiffs

15  were not called back to their jobs, despite repeated requests made for reinstatement.

16  197.  For example, Plaintiff Joseph Toche was not terminated until the end of January 2022,

17  and despite the overwhelming data that the vaccine did not contain the spread of the

18  virus, Defendants ignored the data and terminated Mr. Toche, regardless.

19  198.  Similarly, Brent Mattila wasn't terminated until December 8, 2022, when it was clear

20  that the mass terminations only rid the Department of religious objectors and did not stop

21  the spread of the virus.

22  199.  Plaintiff Eric Sadlon wasn't terminated until September 6, 2022.

23

COMPLAINT                                    45                        **ARNOLD & JACOBOWITZ PPLC**
                                                                       8201 164th Avenue NE, Suite 200
                                                                       Redmond, WA 98052
                                                                       (206) 799-4221

200. A PRA request to SFD seeking all "medical studies and research literature relied upon to develop accommodation policy decisions" resulted in the response, "This wasn't performed at the Seattle Fire Department level, so we don't have any responsive documents." Exhibit AN. But, certainly, Defendants relied on *something* in formulating their policy, whether that information originated with them or someone else.

201. Defendants cannot defend their actions in wrongfully terminating Plaintiffs by alleging that someone else performed the studies Defendants relied upon, while simultaneously claiming they do not have those studies.

202. This is particularly concerning given a recently discovered document recovered pursuant to a PRA request in which Evan Ward, Strategic Advisor and Public Disclosure Officer, had sent PRA requests to Defendant Scoggins, who asked Mr. Ward to, "Please send a file for me to review before you send it out." Exhibit AO. The transparency and legitimacy of a PRA request must be called into question when the public records officer is coordinating with the subject of the records request what documents to release under the law.

203. A PRA request to obtain the records that were attached to emails sent to Defendant Scoggins by Mr. Ward for review by Defendant has not provided any documents to date. Mr. Ward informed Defendant Scoggins that "I'll make sure you have at least a week to review any of your emails that I find." Exhibit AP.

204. This collaboration to interfere in a transparent PRA process is in light of a January 13, 2023, Order by Judge Thomas Zilly, United States District Judge for the Western District of Seattle, granting a motion for spoliation sanctions against the City of Seattle for

Defendant Scoggins' act of "purging….thousands" of text messages,  holding that the Court would instruct a jury in a wrongful death action that it *may* presume that the City of Seattle's deleted text messages were unfavorable to the City. Exhibit AQ, at 23:12-15.

205. This wrongful coordination between Defendant Scoggins and the Public Records Officer regarding which records to release is concerning given the lack of response to multiple PRA requests related to very important issues in this case.

Plaintiffs ridiculed and shamed for their beliefs:

206. Plaintiffs were ridiculed and chastised for not following the protocol.

207. In fact, Plaintiff Steve Collins emailed studies to Defendant Lee and she responded by blocking him.

208. Emails sent by Plaintiffs addressing these concerns were either ignored entirely, or Plaintiffs received mass form-letter replies repeating standard talking points, but no discussion or dialogue.

209. Universally, Plaintiffs were made to feel shamed with many Plaintiffs chastised that they allegedly did not care about others.

210. Plaintiff Joseph Hickey was told by Lt. Kim Leroy at Station 13 that those who don't get vaccinated are cowards, beliefs that were furthered by Defendants' failed leadership.

211. Lt. Bob Kerns told Mr. Hickey he was being selfish and putting others at risk for his own agenda.

212. In fact, Steve Wynn, now a Fireboat Pilot, reported Mr. Hickey to the Battalion Chief for alleged "mental instability" because of his positions on the vaccine.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

213. Chief Hastings stated openly in a room that "The 18th can't come quick enough," a reference to the date religious objectors would be terminated.

214. Liam Roney, union leadership at Local 27, announced at a union meeting that unvaccinated firefighters were selfish for not thinking of others.

215. Other Plaintiffs were ridiculed and chastised for not taking the vaccine.

216. An L27 Facebook page became a consistent source of ridicule and condemnation of religious objectors.  Plaintiffs took many screenshots of those disparaging remarks, some made by those who served in leadership positions.

217. This culture of animosity came from leadership, including Defendant Scoggins, who directly fueled the animosity and hatred towards religious objectors who asserted their religious freedoms by declining to vaccinate.

218. For example, an extremely hostile and vitriol email was sent to Defendant Scoggins, allegedly from an anonymous "proud and loyal Seattle Civil servant." Exhibit AR.

219. In this email, the anonymous author makes sweeping, inciteful and inflammatory conclusions that "these are not religious people…They are mostly liars and cheats. These are the same people who cheered on the January 6th Insurrection from their couches…Generally these anti-vaxxers proudly hate 'liberals'…. They do not mask, and will not…Because the anti-vaxxers are so loud and angry, most of us (like myself), are afraid to rebuke them.  We are physically afraid of them quite frankly, their tempers are flared…." *Id.*

220. Defendant Scoggins forwarded the email to leadership at both SFD and the Mayor's office.  He did not denounce the rhetoric nor take any action to distance himself or SFD

COMPLAINT                                     48                    **ARNOLD & JACOBOWITZ PPLC**
                                                                   8201 164th Avenue NE, Suite 200
                                                                   Redmond, WA 98052
                                                                   (206) 799-4221

from the hate speech. *Id.* Defendant Scoggins received numerous emails in support of Plaintiffs but did not forward those.

221. Each Plaintiff has multiple stories of coercion to take the shot, harassment for not taking the shot, and disparaging comments regarding Plaintiffs' personal decision to assert their religious freedoms.

222. Defendants' failed leadership set the tone for this culture of animosity that caused Plaintiffs considerable pain and suffering.

223. In fact, Plaintiff Snyder, who gave up a college football opportunity to become a third-generation firefighter, suffered to such extremes by the harassment and demeaning behavior of Defendants that he sought medical help through a 911 call after he tried to harm himself.

Defendants' disparate treatment of, and impact on religious objectors versus secular employees:

224. Defendants' actions had a disparate impact on religious objectors over secular employees, as well as a disparate impact on religious objectors compared to medical objectors.

225. Documents obtained through a request made through the Washington States Public Records Act, Wash. Rev. Code 42.56, Exhibit AS, show that SFD received 80 requests for religious exemption, denied 9 of those requests, but then terminated 100% of those remaining employees by refusing to provide an accommodation. Comparatively, SFD

COMPLAINT                                    49                    **ARNOLD & JACOBOWITZ PPLC**
                                                                  8201 164th Avenue NE, Suite 200
                                                                  Redmond, WA 98052
                                                                  (206) 799-4221

1    granted nine medical exemptions and accommodated four,[15] equating to a 44.4%

2    accommodation rate.[16]

226.    A firefighter on a religious accommodation poses no greater threat than a firefighter on

3

4    a medical accommodation.  Both could have been accommodated.

227.    Tiffany Washington, Deputy Mayor, stated, "[p]lease note: the department has to

5

6    prioritize those with medical exemptions. Once you address accommodations for this

7    group you can move to those with religious exemptions." Exhibit AT.

228.    Defendants also required religious objectors to burn their own leave while waiting for a

8

9    decision on a religious exemption or accommodation, whereas secular, medically exempt

10    employees were given paid leave. Exhibit AU.

229.    Defendant Lee showed her animus to religious objectors when she told Jeff Vale,

11

12    terminated with a religious exemption and thus a civilian, that he could *not* visit his

13    former crew at Fire Station 24 like any other visitor who was allowed to visit with no

14    vaccination and masks were optional. Exhibit AW. "No, it's not okay for you to visit

15    Station 24," Lee stated, and then dismissed his questions regarding the incongruent

16    treatment between religious objectors and the public, stating, "We have already

17    responded to your EEOC charge, which answers your own questions regarding

18    accommodation determinations by SFD." *Id.*

19

20

21    ---

[15] A copy of the four letters granting accommodations to four firefighters who received medical exemptions were obtained through a PRA request. *See* Exhibit AV.

22    [16] It is unknown how many of those not accommodated for a medical exemption also had a religious exemption.  This is especially relevant given that two Plaintiffs had both religious and medical exemptions but were denied accommodations for both.

23

COMPLAINT                                   50          **ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

230. A history of Defendants' religious discrimination is also evidenced in the treatment shown to Seattle Firefighter James Wood, who was forced to take the shot or lose his livelihood, including health care for a special needs child.

231. As described in his Declaration, Exhibit AX, Lt. Wood, as part of a tradition of SFD offering $1500 for the construction of a table to be used by station members willing to volunteer their time, resources, and talents, Mr. Wood worked with local architects to design a table, which would have cost between $12K and $17K. As this was not economically feasible, Lt. Wood embarked on the effort to build the table himself. He felled a 100-foot Douglas Fir tree in his backyard, and used personal funds to buy an Alaskan Mill, steel for the legs and absorbed other costs for kiln drying.

232. Working together with Daryl Finley another fellow Christian, both Lt. Wood and Mr. Finley built the table together, collaborating with ideas, time and resources.  Four years later, the table was completed.

233. As they were both committed Christians, both saw the effort as a ministry, to give of their time and talents as Scripture commands.  "This table project was a manifestation of that duty to give honor not to ourselves, but to our Creator God and the sacrifice He made in giving up His Son for us. *Id.* ¶ 22. They decided to make "this table a testimony of our faith and God's glory and we decided that we would burn etch, in small print, a Bible verse on the *underside* of the table top," *id.* ¶ 24, not visible unless lying on the floor looking up. *Id.* ¶¶ 24-25. The verse was John 15:13: "Greater love hath no man than this, that a man lay down his life for his friends." (KJV).

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

234. The City of Seattle Human Resources made the decision that the table could not remain at the station with the Bible verse on it.  Lt. Wood and Mr. Finley chose not to remove the verse, *id.* ¶ 32, and were forced to remove the table from the station.

235. Ironically, the Bible verse chosen, John 15:13, appears on a plaque visible from the street outside Station 32, originally placed in 1997 and reinstalled at the new station grounds in 2018. *Id.* ¶ 39.

236. Today, that same table is used daily at a fire station in Arlington, WA, where the Chief of that department agreed to accept the table as a gift on the condition that the Scripture etching on the underneath of the tabletop remain unaltered. *Id.* ¶ 34.

237. Lt. Wood's declaration also describes a progressive trend of increasing discriminatory behavior from Defendants against those of religious faith. *Id.*

238. This religious animosity resulted in disparate impact and disparate treatment of those with sincerely held religious beliefs. "The risk posed by an unvaccinated, exempt employee is the same regardless of the reason that the employee obtained the exemption. In other words, an employee exempt from the Mandate for medical reasons presents the same risk of COVID-19 transmission in a high-risk role as does an employee exemption from the Mandate for religious reasons…Accordingly, giving priority consideration to employees in high-risk roles for secular exemptions over those with religious exemptions is likely to fail strict scrutiny." *UnifySCC v. Cody,* 2022 WL 2357068 (N.D. Cal. Jun. 30, 2022).

239. Firefighters with a sincerely held religious belief could have been provided the same accommodations offered to medically exempt firefighters.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

240.   Defendants claimed in numerous EEOC Position Statements that "daily testing was very expensive and didn't capture contagion timeframe," Exhibit AY, at 10, but this was also a ruse for termination, as Defendants were testing and masking at the time and continued this protocol even after terminating Plaintiffs.  And regardless, many Plaintiffs offered to pay for their own testing and masks.

241.   For example, on September 27, 2021, a Joint Safety Committee Meeting between Labor and Management at SFD discussed the policy of SFD just prior to Plaintiffs' termination, stating, "current policy is to follow CDC guidelines which state that … vaccinated and exposed don't need COVID testing before working. Washington state is recommending that if vaccinated and exposed then do COVID testing prior to work shift. Chief Barrington said that we would like to move forward with this." Exhibit M.

242.   Thus, Defendants had already made the determination in September 2021, prior to termination of Plaintiffs, that they would exceed CDC guidelines and require testing prior to work shift for vaccinated workers, but then claimed the process was too costly for the unvaccinated religious objectors.

243.   In this regard, Plaintiff Jeff Vale offered to personally pay $5000 toward the cost of testing, but this was denied by Defendant Lu.

244.   This process was inherently discriminatory in that it treated religious objectors adversely compared to secular employees, permitting accommodations for secular employees that were denied to Plaintiffs as religious objectors.

COMPLAINT                                            53          **ARNOLD & JACOBOWITZ PPLC**

245. Plaintiffs were also treated differently in that they had to guarantee no ability to transmit the virus to others, yet secular employees who were vaccinated were retransmitting and reinfecting in extraordinary numbers, with no burden on their employment.

246. Plaintiff Peter Denton was sent home by his Battalion Chief to quarantine because he was exposed to COVID-19 from a vaccinated firefighter.  The firefighter was identified to Mr. Denton. Thus, a vaccinated firefighter with a breakthrough case of COVID-19 was allowed continued employment, while Mr. Denton was terminated, a rashly arbitrary decision. Mr. Denton has never contracted COVID-19 to this day, never had a virus transmission traced to him, but was treated arbitrarily and discriminated against by Defendants.

247. This also happened to Plaintiff Andy Barber, who was infected and caught COVID from a vaccinated firefighter in September 2021, who remained employed while Mr. Barber was terminated.

248. Moreover, a SFD memorandum dated December 17, 2021, continued this policy, with Defendant Scoggins stating, "members are also authorized and encouraged to use the POCCT tests in the Station at the start of each shift…no test is perfect, but the POCCT tests detect contagious people close to 80% of the time." Exhibit AZ.

249. This evidenced disparate treatment of religious objectors versus other employees.

250. Defendants created different excuses to deny accommodations, but then never responded to Plaintiffs, who called out the excuses demanding justification.

251. For example, Peter Denton was told by Defendant Lu that testing *can* produce false negatives, to which Mr. Denton asked for documentation on such a claim, as well as the

cost per test the Department pays. Exhibit BA. Mr. Denton received no reply and was terminated without further explanation.

252. Defendants misrepresented the language of the Proclamation in its application to Plaintiffs who sought an accommodation.

253. This disparity between accommodations granted to secular and nonsecular employees at SFD evidence disparate treatment and/or disparate impact demanding strict scrutiny. *See Kane v. DeBlasio,* 19 F.4th 152 (2nd Cir. 2021).

Defendants failed to provide an interactive dialogue:

254. Defendants' denial of accommodations to Plaintiffs often came in the same letter that accepted their sincerely held religious exemption. Most Plaintiffs did not even know they had received an exemption when they were all uniformly told that there would be no accommodation.

255. This process was inherently flawed, as it did not allow for a legitimate process of dialogue before a decision was made to terminate.

256. Without an identifiable dialogue with each Plaintiff, there was no way Defendants could have identified an undue burden Defendants would have suffered had they accommodated Plaintiffs. *See Groff v. DeJoy,* No. 22-174 (June 29, 2023) (holding that *TransWorld Airlines v. Hardison,* 432 U.S. 63, requires not just a *de minimis* burden, but employer must show "that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business", *Groff* at *1-2).

257. Defendants outlined a myriad of factors it allegedly considered in denying accommodations to Plaintiffs, but the overwhelming and exhaustive list of factors allegedly considered simply gave excuse to not accommodate, evidencing the predetermined nature of the process used.

258. For example, Andrew Lu, Director of Human Resources, stated, "after considering a number of factors including, but not limited to: the frequency, proximity, and duration of contact your position typically has with other employees, customers, the public, business partners and others; the type of work environment; The available ventilation; and the space available for social distancing; and the risk of other people in the setting who will have contact or may have contact with you and what protective measures can reasonably and consistently be put in place to create a safe work environment for you and the people you will be around, SFPD is unable to identify a reasonable accommodation for you at this time." Exhibit BB.

259. The letter continues with even more reasons allegedly considered: "Your current job type has essential duties that incur indoors or outdoors that may require unavoidable or unpredictable interaction and or exposure to others, including non-employees, who may be ineligible for a vaccination or whose vaccination status may be unknown period we are unable to find a reasonable accommodation for you within your current position and do not have an alternative vacant position available." *Id.*

260. Defendants discussed none of these issues with any of the Plaintiffs, evidencing the one-sided nature to the process.  This is not interactive.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

261. More telling, Defendants sent termination letters that did not identify *why* the Plaintiffs could not be accommodated, relying only on the allegation that Defendants "considered" a myriad of factors and concluded that Plaintiffs would have "unavoidable or unpredictable interaction and exposures to others," which does not explain how that creates a hardship or why it cannot be accommodated. *Id.*

262. Tellingly silent are specifics regarding whether these "unavoidable" or "unpredictable" encounters pose a risk, what that risk was, and the science or data supporting that assertion.

263. Defendants relied on innuendo and broad claims of "consideration," apparently believing that the more factors "considered," the more legitimate their position.

264. Moreover, there is no indication that Defendants considered the public interest in enforcement of civil rights statutes. *Keene v. City and County of San Francisco*, 2023 WL 3451687, at *3 (9th Cir. May 15, 2023) (citing *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138-39 (9th Cir. 2009), *Eynart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1156, 1165-66 (9th Cir. 2011)).

265. Nor did they consider that they gave Plaintiff "a Hobson's choice: lose your faith and keep your job, or keep your faith and lose your job." *Keene,* 2023 WL 3451687, at *2.

266. "Before [restricting religious practice due to COVID-19], we have a duty to conduct a serious examination of the need for such a drastic measure." *Brooklyn v. Cuomo,* 141 S. Ct. 63, 68 (2020).

267. Nor did Defendants consider the *Hardison* case, reaffirmed in *Groff, supra,* and the "net analysis" requirement when considering the hardship to Defendants and the impact it

COMPLAINT

57

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

would also have on Defendants' business. Defendants' actions in terminating Plaintiffs had a catastrophic financial impact on the City of Seattle and the services it is duty-bound to provide to its citizens.

268.   The form letter that served as a denial of accommodations letter, obtained through a PRA request, that was sent to all Plaintiffs was a form letter that simply required filling in the name, date, and the individual's position, without consideration of these issues.  Exhibit BC.

269.   No dialogue with Plaintiffs was even needed to complete the fill-in-the-blank form, and, indeed, none was provided.

270.   For example, Mr. Overstreet was told that his religious exemption was granted on October 6, 2021, and that he would then allegedly enter an "interactive process" to identify an accommodation. Exhibit BD, at 17-19. When Mr. Overstreet received no further communications regarding accommodation, he emailed Defendants Lu and Scoggins on October 6, 2021, at 10:57 am, repeating his request for an accommodation, asking about the alleged "interactive process" to which he was told would begin, and requesting a *Loudermill* hearing. Approximately four minutes after sending his request to begin a dialogue, Mr. Overstreet received a form letter stating "SFD is unable to identify a reasonable accommodation for you at this time." *Id.* at 19. There obviously had been no discussion in the warp speed to terminate.

271.   In fact, Mr. Overstreet questioned Defendant Lu regarding the lack of any interactive process, Mr. Lu stated, "This back and forth communication is interactive," *Id.* at 18, completely missing the point that Defendant Lu had already decided that Mr. Overstreet

COMPLAINT                                              58                    **ARNOLD & JACOBOWITZ PPLC**

would be terminated and had already sent him a final decision regarding termination and

accommodation.

272. Dialogue is not legitimate if it occurs after the decision. It was apparently lost on

Defendants Lu and Scoggins that a dialogue must take place before the final termination

letter.

273. Given the rapid speed at which Plaintiffs were terminated after seeking an exemption, it

was virtually impossible for even Defendants to conduct a thorough analysis of any of

these factors allegedly considered, much less all of them.[17]

274. The number of factors allegedly analyzed simply gave plausible deniability to the claim

the Plaintiffs were terminated based on their religious faith.

275. And regardless, none of the Plaintiffs were allowed any input into the exhaustive list of

factors Defendants allegedly considered.

276. The process was one-way and one-sided.

277. In fact, Sascha Sprinkle, OOC Labor Negotiator, Labor Relations Division, Seattle

Human Resources, City of Seattle, admitted in a January 31, 2022, email that "**I believe

that there is a risk associated with how the interactive process went…" and

continued by acknowledging that "the spirit of an interactive process wasn't

completely followed and I think there may be some risk there.**" Exhibit BE (emphasis

added).

---

[17] The speed at which Defendants terminated Plaintiffs is shown by the level of factual errors in communications Plaintiffs received. For example, Andrew Lu wrote emails to Plaintiff Ian Condon, referring to him as Todd. Exhibit BF.  It is unclear what data was used, based on this misplaced identity, to deny Mr. Condon an accommodation.  Defendants also coerced Plaintiffs to "resign" as opposed to being terminated.  Plaintiff Dahlin specifically notified Defendant Scoggins and others that he was "declining that option" to resign, Exhibit BG, but in Mr. Dahlin's record of assignment, Exhibit BH, it states he "resigned."

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

278.  Ms. Sprinkle also stated, with respect to a particular grievant, "[h]is accommodation denial letter was sent to him prior to an interactive process occurring." *Id.* This was the same procedure followed for every Plaintiff, many who were first notified they would be terminated without accommodation before they even received notice regarding a decision on their request for a religious exemption, without any dialogue precipitating.

279.  Ms. Sprinkle also stated the obvious, that "**the denial letter states that nothing short of a vaccine would be accommodated, which is the same as saying that SPU will not consider ANY accommodations,**" *id.* (emphasis added), which is not in compliance with Proclamation 21-14, the ADA, Title VII, or WLAD.

280.  Ms. Sprinkle concluded with reestablishing the point that "I also want to acknowledge that your team was under an impossible time constraint in trying to get all these done," *id.,* an excuse not recognized as an exception to complying with constitutional and statutory law, not to mention the Proclamation itself.

281.  Unwittingly, Ms. Sprinkle validated Plaintiffs' very arguments, that Defendants could not possibly have conducted an interactive dialogue with each Plaintiff, much less analyzed the plethora of factors claimed to have been analyzed in denying accommodations, given the "impossible time constraint." *Id.*

282.  The predetermined decision to deny all accommodations, rendering the process a sham, was brought to the attention of Adrienne Thompson, Policy Director, City of Seattle, who was asked to explain in a Teams meeting on or about October 15, 2021, the impossibly restrictive accommodation criteria, which resulted in no accommodations being provided. Exhibit BI.

COMPLAINT                                          60                    **ARNOLD & JACOBOWITZ PPLC**
                                                                        8201 164th Avenue NE, Suite 200
                                                                        Redmond, WA 98052
                                                                        (206) 799-4221

283. In trying to explain the policy, Ms. Thompson stated that the City's position was, "Unless department/city employees could ensure that they would never, or 100% of the time 1) avoid contact with all other city employees, 2) avoid contact with the public, and 3) never come into a city facility yet still work, they would not be able to receive an accommodation." *Id.* Nowhere in the language of the Proclamation does this standard exist but was manufactured by Defendants in violation of the law.

284. After being asked for written confirmation about the City's accommodation policy, as revealed to City HR leads/staff on October 13, 2021, that no accommodations would be given by the city for any religious exemptions, Ms. Thompson stated, "After talking to the attorneys, we are not comfortable providing such a statement."[18] *Id.*

285. During this meeting, there was also discussion that all city department heads should be consistent and unanimous in this position, regardless of work situations, environment, etc. *Id.*

286. This is contrary to the law, which requires an interactive dialogue based on an individual analysis of an employee's working environment, job duties, and ability to accommodate, not a "one size fits all" procedure.

287. Global analysis and denial does not comply with Title VII or WLAD, and is not in accordance with the language of the Proclamation.[19]

---

[18] Attendees at that meeting included Andrew Lu, Jen Chan, Calvin Goings, Sam Zimbabwe, Jim Loter, Sarah Smith, and others.

[19] An additional 32 firefighters were denied religious accommodation and were forced, in violation of their religious liberties, to take the shot in lieu of termination. Exhibit BJ. Additionally, though not final numbers, as of October 19, 2021, 12 individuals resigned due to the mandate, with another 17 forced into retirement, "with what we know so far – more coming." Exhibit BK.

ARNOLD & JACOBOWITZ PPLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

288. The sham nature of the predetermined decision to terminate religious objectors was made evident with Plaintiff Ann-Maree Tedaldi, who teleworked from home throughout COVID, and yet was denied accommodation.  Ms. Tedaldi worked as an Occupational Health and Fitness Coordinator who prepared Academy candidates located all across the nation for recruit school.  Even prior to COVID -19, this was done primarily remotely, as it was a virtual platform that was made available to all candidates regardless of location.  There was no need for public interaction with these candidates, and therefore, no reason why Ms. Tedaldi could not have been accommodated as a telework employee.

289. Ms. Tedaldi likewise worked with business partners such as Future Women in Fire and EMS.  This program was moved to a permanent virtual platform that still operates in this manner. In addition to using a virtual platform for her regular work, Ms. Tedaldi delivered a keynote speaker presentation to the group using this virtual platform. Of the 21 duties listed in Ms. Tedaldi's job description, not one requires her physical presence.

290. The same pre-determined decision was made for firefighters that was made for Ms. Tedaldi.

291. Washington State Department of Health (DOH) clarified that health care workers could be accommodated.  In response to direct question posed by Defendant Scoggins to DOH asking a whether "an unvaccinated health care provider who is exempt from the vaccination requirement [can] still provide direct patient care," the DOH official said "It depends," and then listed a method of accommodating the hypothetical health care provider," and concluded that the question can "be determined through an interactive

62

process. Any accommodation provided must, to the extent permitted by law, require the individual to take COVID-19 safety measures…" Exhibit BL.

292. This language from DOH inherently permits accommodations for health care providers and does not strictly demand vaccination for continued employment, as Defendants have wrongly stated.

293. The DOH specifically stated, "DOH's current guidance does not direct what the accommodation must be. Each employer must make that determination based on existing guidance and protections…" *Id.*

294. Defendants reengaged in confirmation bias to reject any guidance that did not comport with their desire to deny all accommodations and terminate religious objectors.

295. Defendants even denied accommodation to those who were not involved in patient care. For example, Plaintiff Josh Schaapveld sent an email to Defendant Lu indicating that his job involved training Lieutenants at the Joint Training Facility, where he worked in his own office area scheduling, planning, developing, organizing and coordinating Driver/Operator Training, the majority of which involved computer work and phone calls. The training itself was carried out by driver's training instructors. Thus, his job could be done remotely, and there was not patient care or interaction in his position. Exhibit BM. He was denied accommodation, regardless.

296. This was made apparent in a direct question posed to Defendants by Plaintiff Steve Collins, who asked, "Is there a scenario where I can remain unvaccinated and be accommodated? Is there a scenario where (through religious or medical exemption) that a firefighter can keep doing his normal job for the city of Seattle? If there is not a scenario

where I can get an exemption, and be accommodated, I don't want to go through all of this. I'm starting to think this is a charade. I'm willing to do whatever is necessary, but if there is zero chance of being accommodated, I don't want to pretend as if there is. If there is such a scenario, what is it?" Exhibit BN.

297.   Defendants never responded to or answered Mr. Collins' direct question.

298.   This question was repeated in writing and orally by many of the Plaintiffs, who knew the accommodation process was a sham, but were being forced to undergo the theatrics of it.

299.   Plaintiff Jeff Vale provided this same information to Defendants, specifically, that nowhere in the Proclamation did it prohibit health care providers from working without vaccination, and that "the proclamation itself, as you have been shown by Local 27 leadership, suggests testing as a potential accommodation." Exhibit BO. "There is not even a mention of vaccination status in the patient care setting in the DOH and CDC documents." *Id.*

300.   Accommodation was never considered and all conversation by Defendants focused on vaccination or termination.  For example, Plaintiff Jason Overstreet stated, "as I've stated multiple times prior, [the problem] is the lack of any real 'interactive process.' If by interactive, you mean simply issuing me a 'no' as an answer, I will grant you license in your use of words to acknowledge 'process.' If by interactive, you mean a constructive process whereby ideas are exchanged to accomplish the goal of keeping me gainfully employed with minimal burden to the city and the fire department – that, by any standard, simply has not happened." Exhibit BP.

COMPLAINT                                              64

301. Mr. Overstreet attempted to discuss accommodation but became frustrated when Defendant Lu wanted only to discuss Mr. Overstreet taking an unknown "alt vaccine," one that did not utilize fetal stem cells, but nowhere in Mr. Overstreet's request for a religious exemption did he identify fetal stem cell issues. "My religious exemption request, while granted, is not being taken seriously as you consistently deny me accommodations and instead push me towards vaccination, citing issues which I did not myself explicitly cite…discrimination is not only taking place, but has been taking place all along, my religious exemption never having been considered to be valid or true on its face from the beginning." *Id.*

302. As part of the chaos Defendants sent Mr. Overstreet two reasonable accommodation denial letters, retracted the second, then tried to push Mr. Overstreet to accept an "alt vaccine," without still engaging in any interactive process. *Id.*

303. That Defendants found fault with every accommodation pursued by Plaintiffs, manufacturing nonexistent undue hardships without discussion, is exemplified in Plaintiff Steve Ericson's request that he be allowed to go on leave without pay until the emergency passed. He was denied and told that the burden was allegedly administration and staffing costs, without further explanation.[20] This contradicts the holding of *Groff v. DeJoy,* No. 22-174 (June 29, 2023). In addition to leave without pay, Mr. Ericson provided a long list of accommodation suggestions despite no interaction with Defendants, all of which were denied without dialogue. Exhibit BQ.

---

[20] "Finally, in those situations where the employer perceives a significant hazard in keeping the employee on the job, **it can avoid the problem by suspending with pay**." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 544-45 (1985) (emphasis added).

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

1    304.   The chaos created by Defendants was shockingly apparent and best expressed by
2           Battalion Chief Thomas J. Richardson, 6th Battalion A-Platoon, who expressed
3           frustration on behalf of the firefighters he led.

4    305.   Chief Richardson's 12-point email outlined the problems firefighters faced in the lack of
5           coherency orchestrated by Defendants, including a firefighter who had a medical
6           exemption but was forced to vaccinate and became gravely ill but received no guidance
7           from Defendants; a firefighter who submitted a request for religious exemption but
8           Defendants apparently lost it and would not reply to the firefighter despite a one-day
9           looming deadline for termination; the fact that most members had verifiable natural
10          immunity, but were receiving no metrics from Defendants that identify what they used
11          to determine the vaccine requirement; that firefighters were very concerned regarding the
12          safety of the vaccine given the VAERS data showing significant reports of adverse
13          events; that Defendants set precedents to accommodate some employees to not even wear
14          a mask but would not discuss any accommodations with terminated firefighters;  that the
15          Defendants strictly claimed no one could work unvaccinated after October 18, 2021, per
16          the Proclamation, but then allowed those to continue their shift after October 18, 2021;
17          an "astounding" lack of guidance regarding benefits retained if forced to retire; local fire
18          departments accommodating religious exemptions without issue; whether adverse
19          reaction to the vaccine is considered occupational, as many members were forced to burn
20          their own leave when suffering an adverse reaction; the failure to make a specific vaccine
21          available, such as Sinopharm, after Defendants promised to make that vaccine available
22          but did not; failure to advise firefighters who may miss the October 18, 2021 deadline to
23

COMPLAINT                                    66                    **ARNOLD & JACOBOWITZ PPLC**
                                                                   8201 164th Avenue NE, Suite 200
                                                                   Redmond, WA 98052
                                                                   (206) 799-4221

become vaccinated how or if they can return to their position; failure to discuss providing Leave of Absence options for unvaccinated firefighters and allow them to return if they become vaccinated or the mandate expires; and the staffing models' catastrophic prediction of a crisis waiting to happen, including massive browned out units. Exhibit BR.

306.   These issues were rampant across the Department and were never resolved or addressed before terminating Plaintiffs.

307.   Plaintiffs were forced to navigate this system and any question posed was met with the same dogma: get vaccinated or be terminated. This alone caused tremendous anxiety, stress, pain, and suffering to Plaintiffs, not to mention economic devastation.

308.   Of the most concern was Chief Richardson's notification to Defendants that other fire departments across the state accommodated their fire fighters with no adverse consequences and without a single termination, *supra*.

309.   Defendant Scoggins, when questioned by Plaintiff Jason Overstreet during a pretermination hearing regarding Scoggins' knowledge of other fire departments accommodating firefighters, Scoggins at first denied any knowledge of what other fire departments were doing, and then, upon further questioning, admitted that he allegedly only knew about Tacoma Fire Department accommodating their firefighters.  Exhibit BS, at 5.

310.   When asked by Mr. Overstreet, "Can we agree that there are other fire departments that are accommodating operations level personnel," Defendant Scoggins stated, "I don't know if I can agree to that.  If you want to communicate that to me, then I can follow-up

with that." Mr. Overstreet then asked, "Chief, are you saying that you are unfamiliar with any departments that are accommodating operations level personnel in the state of Washington," to which Defendant Scoggins stated, "I'm familiar with Tacoma Fire Department." *Id.* at 5.

311. Mr. Overstreet then confirmed, "And they are offering reasonable accommodations to their firefighters in operations?" to which Defendant Scoggins stated, "Well. Correct. But I don't know how they define reasonable accommodation. That's the piece I don't understand what they're doing and how they're doing it." *Id.*

312. It is unknown whether Defendant Scoggins ever investigated that which he did not know or understand.

313. Accommodation was possible if Defendants had conducted a legitimate interactive dialogue and had not made the pre-determined decision that religious objectors would be terminated.

314. Accommodation was never possible because it was never discussed.

315. Most state fire departments fully accommodated firefighters and did not terminate those with a religious exemption. Exhibit BT.

316. This list of fire departments that accommodated religious exempt firefighters includes some of the largest fire departments, including Tacoma, East Pierce, South Pierce, Vancouver, Spokane Valley and South Snohomish County Fire.

317. South Thurston Fire Department Fire Chief Andrew Schaffran reached out to terminated firefighters seeking firefighters in fully accommodated positions. "[W]e are willing to hire unvaccinated fire service members, as *we have accommodation process*." Exhibit

BU (emphasis added).  Chief Schaffran also stated, "We also understand that many are fighting for their jobs back.  In the near term, we are willing to bring them on with the knowledge that they may leave for higher pay or reinstatement to their previous employer." *Id.*

318.  In a letter of Agreement between the City of Tacoma and Tacoma Firefighters, dated September 7, 2021, it states, "Employees with approved exemption requests will be permitted to remain in their current assignment." Exhibit BV. The Department only required a combination of masks and testing. *Id.*

319.  By example, Plaintiff Andrew Stewart, after being wrongfully terminated by Defendants, was hired by the City of Aberdeen Fire Department a few months later, where he only had to wear a mask on calls, no testing. He then left that fire department and began work for the City of DuPont Fire Department, where he wore a mask on calls and tested once a week. He currently works for Central Pierce Fire and Rescue and is only required to mask in adult homes and hospitals.  He has been fully accommodated at three separate fire departments.

320.  Plaintiff Dennis Stanley was hired by the Hardin County Fire Department in Tennessee with no accommodations required.

321.  Plaintiff Eric Sadlon was hired by a Virginia fire department with full accommodation.

322.  Plaintiff Jeff Vale was hired by Central Pierce Fire and Rescue as a fully accommodated religiously exempt firefighter.

323.  Plaintiff Steve Ericson was hired by Central Pierce Fire & Rescue fully accommodated. Exhibit BW.

COMPLAINT                                    69                    **ARNOLD & JACOBOWITZ PPLC**
                                                                  8201 164th Avenue NE, Suite 200
                                                                  Redmond, WA 98052
                                                                  (206) 799-4221

324.   Plaintiff Zero Iaulualo volunteered with North Whidbey Island Fire Department, which did not require a vaccine and terminated no one.  Mr. Iaulualo then was hired by Kootenai County Fire Department in Idaho, where no vaccination was required, and the Department applauded Mr. Iauloalo's decision to assert his medical freedom.

325.   Plaintiff Emmanuel Hearne was hired by the Idaho State Police where vaccination was not even mentioned.

326.   Spokane Valley Fire Department (SVFD) had 22 exemptions and accommodated every one of them.[21] Not one firefighter was terminated.

327.   This was due to complying with state and federal law and providing an interactive dialogue to discuss reasonable accommodations that did not burden Defendants.

328.   Defendants cannot articulate that they provided this dialogue or that they identified any burden they would have suffered under the *Hardinson* standard had they accommodated Plaintiffs.

329.   The fact that most other fire departments accommodated their religiously exempt firefighters without burden highlights the intent of Defendants' sham process to rid the department of religious objectors.

330.   Under the SFVD accommodation protocol, unvaccinated firefighters were separated and assigned to specific posts where battalion commanders were located, which assisted in staffing considerations, while also undergoing daily testing and wearing N95 masks at all times. *Id.*

---

[21]https://www.kxly.com/news/coronavirus/spokane-valley-fire-department-keeping-all-of-its-firefighters-with-vaccine-exemptions/article_085302ca-e288-528a-a6a6-cc5beeb68811.html (last accessed on July 19, 2023).

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

331. In a rational recognition of the costs associated with these accommodations, Spokane Valley Fire Chief Bryan Collins understood that these accommodations would cost the fire department around $50,000 to $65,000 per year, but he considered that cost insignificant compared to the cost to replace and retrain 22 firefighters. *Id.*

332. Regarding the alleged danger of having unvaccinated firefighters working with the public, Chief Collins recognized that "[t]hey are not more at risk than before. And frankly, they're better protected because we test them every day." *Id.*

333. Chief Collins also correctly articulated Washington state law regarding the accommodation process, stating, "…the Washington State Department of Health has stated that frequent testing, which SVFD is not presently doing, is not an alternative to vaccination. However, *the Department of Health recognized that frequent testing can potentially be a part of an accommodation for those who are exempted from vaccination.*" Exhibit BX (emphasis added).

334. Based on the science acknowledging vaccine failure, Snohomish Fire Department brought back 13 firefighters fully accommodated.[22]

335. Comparatively, Defendants considered none of this data and made a predetermined decision to terminate Plaintiffs as religious exempt employees.

336. Plaintiff Joshua Gibbs, like many of the Plaintiffs, even offered to pay for his own masking and testing. He was denied.

---

[22] https://www.heraldnet.com/news/13-unvaccinated-firefighters-are-cleared-to-return-to-work/ (last accessed on July 19, 2023).

COMPLAINT                                                71                    **ARNOLD & JACOBOWITZ PPLC**
                                                                              8201 164th Avenue NE, Suite 200
                                                                              Redmond, WA 98052
                                                                              (206) 799-4221

337. After terminating Plaintiffs, Defendants acknowledged to secular employees that SFD believed in the efficacy of masking to prevent breakthrough infections, yet they had terminated Plaintiffs as religious objectors claiming masking did not work.

338. Defendant Scoggins wrote in an SFD Memo dated December 21, 2021, "[c]onsistently following masking protocols as per Memorandum No. 112-21 will reduce the chance that potentially expose members will contract a breakthrough infection." Exhibit BY.

339. Defendants also required a "POCCT (rapid) test before work," with "all members working a 24-hour shift …will be asked to follow this testing protocol to help minimize the spread within the Department." *Id.*

340. Andrew Lu also denied accommodations, stating, "If you have questions or would like to propose a reasonable accommodation that does not result in undue burden, please notify Andrew Lu at Andrew.lu@seattle.gov within three (3) business days." Exhibit BB.

341. By the time this was communicated to Plaintiffs, the decision to terminate had already been made and Plaintiffs had already been told they would be terminated.

342. Plaintiffs responded to this request in a timely manner, but all were shut down.

343. The solicitation of accommodation suggestions by Mr. Lu after accommodation was already denied without dialogue was yet another futile step of theatrics in a meaningless process.

344. Sham *Loudermill* hearings provided no progress in allowing Plaintiff a voice in the termination process. Plaintiff Collins attempted to bring William Cleary as his

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

representative to a *Loudermill* hearing but was denied because Mr. Cleary also had a religious exemption to the vaccine. Mr. Cleary was denied access.[23]

345.   Defendants refused to reschedule the *Loudermill* hearing for Plaintiff Ian Condon who was driving his personal car to Tennessee, and thus had to attend the hearing while on his phone and did not have documents available to present.  Defendants denied the ability to delay the hearing even a day or two, and while that in itself would have prejudiced Mr. Condon's ability to present his case, it was ultimately completely irrelevant because the decision had already been made.  This made the process even more maddening.

346.   Defendants did not even follow the law of *Loudermill,* denying all accommodations regardless of any hardship it would pose. "Finally, in those situations where the employer perceives a significant hazard in keeping the employee on the job, **it can avoid the problem by suspending with pay**." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 544-45 (1985) (emphasis added).

347.   In fact, the *Loudermill* was not held for a discussion, but to confirm the decision already reached.  Plaintiffs generally each received final decision letters within 1-2 hours following the completion of the sham hearing.

348.   Defendant Lee likewise was misinformed when she communicated to Plaintiff Collins that it was his responsibility to find an accommodation, a misrepresentation of Defendants' duties and legal responsibilities.

---

[23] Unions provided little to no advocacy on behalf of terminated firefighters.  In fact, based on documents received from a Public Records Act request, there were "no grievances filed by any of the unions (Local 17, 27, 2898, etc.) representing Seattle Fire Department employees…I can confirm that no grievances were submitted regarding unvaccinated employee terminations." Exhibit BZ.

73                    **ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

349. At no time prior to denying accommodation did the Defendants consider leave with or without pay.

350. At no time prior to denying accommodation did the Defendants discuss with Plaintiffs the "essential functions" of their job relied upon to deny accommodation.

351. At no time prior to denying accommodation did Defendants identify any accommodation that would "eliminate the risk" short of vaccination.

352. At no time prior to denying accommodation did the Defendants discuss with Plaintiffs any potential accommodations that would be appropriate for each Plaintiff.

353. At no time prior to denying accommodation did the Defendants discuss with any Plaintiff the undue burden under the *Hardison* standard that Defendants would suffer as a result of accommodating Plaintiffs' exemptions.

354. At no time prior to denying accommodation did the Defendants engage in any discussion with any of the Plaintiffs the possibility of utilizing personal protective equipment (PPE) as a means of accommodation.

355. This was a unilateral determination by Defendants that religious exempt employees would be terminated, and this decision was made without an interactive dialogue with each Plaintiff.

356. Defendants created their own "mandate within the mandate" to rewrite the Proclamation and apply it as they pleased.

357. Plaintiff Joseph Toche brought to the attention of Defendants the fact that Defendants' abbreviated process did not allow for any dialogue or discussion regarding

COMPLAINT                                                          74                **ARNOLD & JACOBOWITZ PPLC**
                                                                                          8201 164th Avenue NE, Suite 200
                                                                                          Redmond, WA 98052
                                                                                          (206) 799-4221

1     accommodations, yet Defendants terminated him stating that the accommodation process

2     concluded there was no accommodation. Exhibit CA.

3  358.  Mr. Toche highlighted the obvious that there could be no accommodation process when

4     no accommodations were discussed with him. *Id.*

5  359.  Similarly, like most Plaintiffs, Plaintiff Brian Paterik received notice from Defendant Lu,

6     on October 6, 2021, stating that SFD "has received your approved religious exemption

7     request and will begin the interactive process to determine whether an effective

8     reasonable accommodation exists that will allow you to continue to perform the essential

9     functions of your job." Exhibit CB.  Mr. Lu also stated that "[e]ach request is evaluated

10    on a case-by-case basis to determine whether an effective reasonable accommodation can

11    be identified."

12  360.  Exactly one week later, on October 13, without any discussion, dialogue interaction or

13    contact, Mr. Paterik received notice that his accommodation was denied. *Id.* Like

14    Plaintiff Toche, there could be no accommodation process when no accommodations

15    were discussed, *supra.* Without any suggested accommodations, there could be no ability

16    for Defendants to meet the *Hardison* undue hardship standard, reaffirmed in *Groff v*

17    *DeJoy, supra.*

18  361.  This was the same timeline – October 6, 2021, and October 13, 2021 – that was followed

19    for most, if not all Plaintiffs, in denying accommodations.

20  362.  This begs the question of how Defendants could have conducted a meaningful

21    accommodation process, especially considering the plethora of factors Defendants

22    allegedly analyzed, and accomplished this in five business days for all Plaintiffs.

23

COMPLAINT                                     75                **ARNOLD & JACOBOWITZ PPLC**
                                                                8201 164th Avenue NE, Suite 200
                                                                      Redmond, WA 98052
                                                                        (206) 799-4221

363. The decision to terminate all of the Plaintiffs was made even before Plaintiffs were notified on October 6, 2021, that their religious exemption was approved.

364. The approval of the religious exemption was meaningless given that the decision to terminate religious objectors had already been made prior to October 6, 2021, or October 13, 2021.

365. Plaintiffs Brent Mattila and Joseph Hickey likewise received this same form letter with the same dates, which was their first notice that they had even received a religious exemption, much less that they were being terminated. *See, e.g.,* Exhibit CC.

366. Plaintiff Steve Ericson received the same form letter as Mr. Hickey and Mr. Paterik, on the same days, October 6, 2021, and October 13, 2021, notifying him, unbeknownst to him, that "[y]our request was evaluated, and an individualized interactive process was undertaken to identify a reasonable accommodation that does not result in an undue hardship." Exhibit CD.  These emails were direct misrepresentations of the truth, as no dialogue, interactive or otherwise, ever took place.

367. This was an "all in one" religious exemption approval and accommodation denial that allowed no discussion in the interim to allow for an interactive dialogue.

368. Neither Mr. Paterik, Mr. Toche, Mr. Hickey, or any of the Plaintiffs, were ever contacted to discuss the voluminous number of factors Defendants allegedly considered, *supra,* in their sham analysis.

369. In fact, as discovered in a PRA document request, the letter sent to each Plaintiff was a form "fill in the blank" letter mass mailed to all Plaintiffs. Exhibit BC.

COMPLAINT

76

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

370. This happened routinely to all Plaintiffs – a sham process that proceeded at rocket speed in the predetermined decision to rid the agency of religious objectors.[24]

371. Likewise, most Plaintiffs were given less than a week after they were denied accommodations to collect personal gear and vacate their stationhouse. Mr. Paterik had less than a 5-day notice to wrap up a 24-year career.

372. This infringement on Plaintiffs' civil liberties was recognized by many within the ranks of Defendants.

373. For example, Chris Lombard, Interim Director, Community Safety/Communications Center (CSCC) released a memo in October 2021, stating, "These people are hurting. They are angry. They believe they are being separated due to a mandate that is not only an infringement on their personal freedom but is being enacted for primarily political reasons. Most were given a religious or medical exemption from the mandate, received letters that an 'individualized, interactive process' would be undertaken to find reasonable accommodations to keep their jobs, followed almost immediately by a letter saying no reasonable accommodations could be made…." Exhibit CE.

374. Mr. Lombard recognized that Defendants refused to consider personal protective equipment (PPE), despite the fact that PPE was used for 18 months by all Plaintiffs and not one case of COVID-19 transmission was traced to any Plaintiff.

---

[24] Position Statements provided by Defendants to EEOC Complaints were routinely wrong, both administratively and substantively. For example, the Position Statement denying discrimination for Jason Overstreet had his name, hiring date, class number and probation dates all wrong. Exhibit AY.

COMPLAINT                                         77                        **ARNOLD & JACOBOWITZ PPLC**

375. "Accommodations such as testing and wearing N95 masks, which have kept both our staff and the public safe for two years, have been determined to be no longer acceptable." *Id.*

376. Defendants fundamentally misrepresented the terms of Proclamation 21-14, demanding as a condition of employment no public exposure. This demand misrepresents the language of the Proclamation, which required agencies to comply with all state and federal law, specifically citing ADA, the Rehabilitation Act, Title VII, WLAD, and any other applicable law." Proclamation 21-14, *supra.*

377. Nothing in the Proclamation requires "no public exposure."

378. Defendants made the predetermined decision that nothing other than vaccination would be acceptable, which violated the Proclamation, ADA, Title VII, and WLAD.

379. This standard of requiring absolutely no public exposure evidences the discriminatory nature of Defendants' actions, as Defendants did not terminate secular employees who reinfected and transmitted the virus to others.

380. In essence, Defendants created their own mandate within the mandate, establishing their own criteria in awarding accommodations – no public exposure – that did not comply with the Proclamation or federal and state law.

381. Defendants never explained why they could not "address its legitimate concerns with rules short of a total ban." *South Bay United Pentecostal Church v. Newsom,* 141 S. Ct. 716, 718 (2021) (Thomas, J. and Gorsuch, J., concurring), "nor…why the less restrictive options," *id.,* were not available.

382.   Defendants were more interested in the feelings and perceptions of vaccinated secular employees than they were interested in complying with state and federal law.   For example, Dr. Michael Sayre and Defendant Scoggins frequently expressed concerns for how the unvaccinated made the vaccinated feel fearful and afraid.  These statements were made at numerous Q&A sessions during TEAMS meetings.

383.   Neither the Proclamation, ADA nor WLAD require an analysis of what other individuals think or feel about the law.

Undue hardship not identified, all based on speculative or theoretical harm:

384.   Defendants denied accommodation based on purely speculative harm regarding Plaintiffs' *potential* public interaction threat.

385.   The law requires identifying an "undue hardship," not speculative harm that may theoretically be transferred to others. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977).

386.   "An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information." Exhibit CF.

387.   Even before termination, Defendants were aware of a September 2021 study from the University of Washington entitled "Risk For Acquiring Coronavirus Disease Illness among Emergency Medical Service Personnel Exposed to Aerosol-Generating Procedures."[25] Exhibit CG.

---

[25] *See* https://wwwnc.cdc.gov/eid/article/27/9/21-0363_article (last accessed on July 19, 2023).

COMPLAINT                                          79                    **ARNOLD & JACOBOWITZ PPLC**

388. The study concluded, "We observed a very low risk for COVID-19 infection attributable to patient encounters among EMS first responders, supporting clinical strategies that maintain established practices for treating patients in emergency conditions." *Id.*

389. Not one case of COVID-19 was traced to any of the Plaintiffs in the 18 months during the pandemic prior to their termination.

390. In fact, the SFD responds to approximately 180,000 calls per year, many to large apartment complexes, large football venues, and other major events. Exhibit P. Yet Defendant Scoggins has stated that he only knows of one example of a Firefighter transmitting COVID to a member of the public as a result of these millions of contacts, *id.,* and it is unknown who that individual even is.

391. In addition to the low risk of transmission by first responders, including Plaintiffs who held EMT and paramedic certifications, the fact that the vaccine failed to stop transmission and reinfection rendered Defendants' demand for vaccination not only based on hypothetical harm, but was also arbitrary and capricious towards Plaintiffs.

392. Defendants refused to answer Plaintiffs' inquiries regarding how Plaintiffs posed any greater "risk of harm" vaccinated than unvaccinated, given the abject failure of the vaccines to prevent infection and transmission, and given the University of Washington study, as just a single example. This question is notwithstanding that the criteria is "undue hardship," not "undue harm." There was no hardship to Defendants accommodating Plaintiffs, and, indeed, none was alleged.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

393. Plaintiffs worked successfully throughout the crisis utilizing PPE, with no stated reason why continued use of PPE was not equivalent, if not better, protection against COVID-19 infection and transmission, especially in light of the failed vaccine.

394. The ability to accommodate Plaintiffs through successful use of PPE was established by the majority of fire departments across the state that fully accommodated religious objectors.

Defendants failed to consider the net burden to the agency caused by mass terminations:

395. In their refusal to consider accommodations for Plaintiffs, Defendants failed to balance the undue hardships to the citizens of Washington State and the mission of SFD with their decision to deny accommodations.

396. Defendants relied on massive calls for overtime to compensate for the staffing crisis it created.

397. OFM guidance for granting accommodation required consideration for "causes a lack of staffing," as well as "[s]ize and operating costs of the business impact of the accommodation on the agency as a whole." Exhibit CH.

398. That guidance also required Defendants to consider "safety concerns and security consideration." *Id.*

399. Defendants created their own undue burden.

400. After termination of Plaintiffs, Defendant Scoggins called the result a "staffing crisis," requiring a massive relocation/transfer of firefighters, creating a new "Drawdown Matrix" placing some departments out of service, and addressing "daily company brownouts." Exhibit CI.

COMPLAINT                                           81                    **ARNOLD & JACOBOWITZ PPLC**

401. Records obtained from a PRA request showed that for each month through the years 2019 through March 2022, overtime costs nearly doubled for each month since the mandate took effect. For example, overtime costs in November 2019 were $1.20 million, while overtime costs for that same month in 2021 just after the mandate took effect were $2.06 million. Exhibit CJ; *see also* Exhibit CK.

402. Overtime costs in March 2019 equaled $1.15 million, which increased to $3.03 million for the month of March 2022. Exhibit CJ.

403. Due to the catastrophic staffing crisis, SFD issued Memorandum No. 16-22, which announced in February 2022 the launch of a "New Nurse Navigation Line," whose objective was to reduce 911 traffic and transportation by "referring callers to a more appropriate resource.  This will help minimize the risk of exposure to first responders and deliver medically appropriate care to our citizens by providing a wider network of services." Exhibit CL.

404. This announcement inherently assumes knowledge that Defendants' fully vaccinated workforce was still susceptible to COVID-19 infection, given the words that the hotline "will help minimize the risk of exposure to first responders…." *Id.*

405. These were also jobs that did not require a vaccine and could have been offered to Plaintiffs.

406. Still, Defendants refused to recall terminated religious objectors back to work.

407. "Browned out" units are those units whose inadequate staffing required those units to be inoperative. Any firefighters assigned to a unit that was insufficiently manned were redirected to fill staffing shortfalls elsewhere in the Department, while 911 calls in the

COMPLAINT                                      82                    **ARNOLD & JACOBOWITZ PPLC**

"browned out" unit were redirected to other units in surrounding districts to respond to emergencies. This resulted in delayed response time and corresponding safety concerns.

408.   In December 2021, there were 175 browned out units, 130 units in January 2022, and 69 units in February 2022. Exhibit CM.

409.   Documents received from a Public Records Act request show continued "browned out" units, with 67 in October 2022, 29 in November 2022, 71 in December 2022, and most recent figures for March 2023 showed 24 browned out units. Exhibit CN.

SFD refused to consider natural immunity:

410.   As noted *supra*, many Plaintiffs presented a positive COVID-19 antibody test and/or a positive COVID-19 test, but Defendants refused to consider this evidence of natural immunity.

411.   A highly publicized Israeli study released in August 2021,[26] as a point in favor of accommodating exempt employees. These positive tests were historical and were presented after full recovery.

412.   The benefits of natural immunity were published in a report issued by contributing authors at the University of Washington February 16, 2023. Exhibit CO.

413.   Defendants provided no evidence of any COVID-19 transmissions traced to any Plaintiff.

414.   Plaintiffs worked successfully throughout the crisis utilizing PPE, with no stated reason why continued use of PPE was not equivalent, if not better, protection against COVID-19 infection and transmission, especially in light of the failed vaccine.

---

[26] https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1 (last accessed on July 19, 2023).

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

415. Plaintiff Collins provided Defendants more than 100 peer reviewed studies that confirmed natural immunity to be better than vaccination, but Defendants denied the data. Exhibit CP.

416. It is unclear what data Defendants relied upon in denying natural immunity or why the published studies presented were insufficient.

<u>Arbiter decisions analyzing the same procedures used by Defendants found those procedures constitutionally violative of employees' rights</u>:

417. Five different arbiters heard grievances filed on behalf of Washington Department of Fish and Wildlife (WDFW), Department of Revenue (DOR), and Department of Corrections (DOC) employees wrongfully terminated using the same procedures used by SFD in the instant case.

418. In all three WDFW arbitrations by three different arbiters, it was found that WDFW failed to find a reasonable accommodation before asserting an undue hardship, had conclusions unsupported by evidence to establish an undue hardship and/or violated the Proclamation and Title VII.

419. In the DOR arbitration, the arbiter found that DOR "did not establish that it paid serious attention to [employee's] reassignment of her site visit responsibilities, and because the record does not show that such reassignment [of allegedly essential job functions] would have presented an undue hardship," DOR violated the CBA and MOU.

420. In the DOC Arbitration Opinion and Award, the arbiter found that the employer failed to abide by the ADA and WLAD, "never conducted the required individualized assessments of whether the grievant posed a threat in the workplace or her present ability

to safely perform the essential functions of her job," made only a "generalized determination" that the employee posed a risk unvaccinated  to the health and safety of others, and that DOC "failed to engage in the required interactive process in considering possible reasonable accommodations," but "simply concluded that reassignment was the only available accommodation for the grievant's unvaccinated status."

421. In the Ruthanna Shirley Arbitration Decision and Award, PERC No. 134851-P-22, Exhibit CQ, Arbiter Michael Anthony Marr found that, "[t]here is nothing in the evidence to indicate that the Agency considered testing or any alternative accommodation to vaccination." *Id.* at 37.

422. Arbiter Marr also found that the agency did not consider masks and social distancing as accommodations and that "[f]ailing **to consider** available accommodations is extremely concerning.  It is difficult for the Agency to establish good faith when EEOC and/or CDC guidance is ignored and not considered." *Id.* at 36 (emphasis in original).

423. Additionally, the agency "did not take this opportunity to explain with specificity," why masks and social distancing were no longer a reasonable accommodation. *Id.* at 39. "The position taken by the Agency constituted a hypothetical hardship in violation of Title VII because it was conclusory and unsupported by data and other statistical evidence." *Id.* at 40.

424. In the John Hone Arbitration Decision and Award, PERC No. 134845-P-22, Exhibit CR, Arbiter Michael E. Cavanaugh specifically found that the Agency failed to follow the interactive process and that such failure could not be excused. *Id.* at 10.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

425. Arbiter Cavanaugh also rejected the Agency's assertion that, "in effect, no inquiry into an individuals' work situation – beyond evaluating a job description – was necessary. *Id.* at 10-11.

426. "The Department failed to afford [Mr. Hone] the individualized consideration of his religious accommodation request that is required by law and by the parties' MOU. In addition, at least as applied to Mr. Hone, The Department's *per se* rule against masking and distancing as part of an appropriate religious accommodation violated the law and the MOU." *Id.* at 16.

427. In the Tyler Kave Arbitration Decision and Award, PERC No. 134848-P-22, Exhibit CS, Arbiter Barbara J. Diamond found that the Agency did not provide a legal accommodation process before terminating Mr. Kave. *Id.* at 25.

428. In an arbitration on behalf of LaRetta Martin, DOR, Case No. Arbiter's X59, a terminated employee suggested numerous accommodations to site visits, including allowing a co-worker to perform that part of her job, which DOR refused, claiming it was an essential function of her job. The arbiter found "that claim is problematic: (1) the Department apparently functioned well without [site visits] for an extended period of time; (2) the position description signed by [employee], her supervisor and her appointing authority…mentions such travel but does not show it as essential; and…site visits do not seem to satisfy any of OFM's trigger characteristics for essential job functions…or to meet the simple test that 'An essential function is a completed task, not how that task is completed.'" Exhibit CT at 9, n.3.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

429. The DOR Arbiter also discounted the "'customer service' value of site visits," recognizing that "the customer was accomplished by phone and Zoom for some years during the acute COVID program and nothing in the record supports the suggestion that those methods are no longer satisfactory just because in person contact is now possible." *Id.* at n.4.

430. "DOR seems to have given no serious consideration to that proposal [to allow a co-worker to perform site visits]." *Id.* at 9.

431. Additionally, DOR apparently never considered whether that shifted burden could be alleviated by shifting some of that other employee's work to [the religious exempt employee] in return for the inspection work," *Id.* at 10 (citing WAC 162-22-065(2)), stating, "Possible examples of reasonable accommodation may include, but are not limited to: (a) Adjustments in job duties,…or scope of work…." *Id.* at 9, n.6.

432. The arbiter stated: "But one of the common methods of accommodation is a change in rules, policy, or procedures and such an option seems to have at least deserved consideration in this case…DOR's offhand rejection of [employee's] suggestion to redistribute her site visits duties fell short of DOR's responsibility to accommodate her sincerely held religious belief….It was the Department's responsibility to seriously consider that proposal, and its immediate dismissal did not satisfy that responsibility. Moreover, on this record, more likely than not, if the Department had considered it, the workloads could be balanced, miss Martin's suggestion was in fact a reasonable accommodation." *Id.* at 11.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

433. The arbiter also addressed the fact that the employee did not violate any rule, yet was still terminated without just cause, but "[b]ecause the just cause issue is moot in the case at hand I decline to address such a fundamental issue on the basis of such a limited record." *Id.* at 12.  "But in the case at hand, DOR does not allege that [the employee] violated any rule or fell short of any policy. This case springs from the Governor's vaccination mandate; and that mandate does not say, 'Be vaccinated or we will let you go.' What it says is 'Be vaccinated unless you fall under a medical or religious exception or we will let you go.' There is no dispute that [the employee] did not violate that rule."

434. In the Michelle Edwards's Arbitration Decision and Award, FMCS Case No. 220323-04584, Exhibit DB, Arbiter Stephan Douglas Bonney, stated, "Although the Employer's determination of direct threat and reasonable accommodations must be evaluated based on the medical knowledge available in the fall of 2021 and not based on current understandings of the virus, the DOC failed to comply with the requirements of ADA. Specifically, it failed to make an individualized assessment of the threat posed by the grievant's performance of her job and it failed to engage in the required interactive process in determining the possible reasonable accommodations of the grievant's disability (unable to be vaccinated due to a medical condition)." *Id.* at 9

435. Citing previous arbitration decisions and awards on behalf of WDFW employees, Arbiter Bonney stated, "I find, similarly to Arbitrator Cavanaugh, that the Employer improperly applied a *per se* rule when it concluded unvaccinated employees would pose a direct threat in the workplace and when it decided that reassignment was the only possible reasonable accommodation for unvaccinated employees." *Id.* at 10.

436.    Defendants followed the same procedures and methodology used by WDFW, DOR, and DOC in establishing a *per se* rule against accommodation based on the presumption of an unproven threat unvaccinated workers posed. This has been found constitutionally violative of employee's rights in five separate arbitrations.

Reinstatement:

437.    On February 6, 2023, the City of Seattle dropped the vaccine mandate.

438.    Shortly thereafter, many Plaintiffs requested reinstatement to the employment register under the City of Seattle's Public Safety Civil Service Commission (PSCSC) Rules, Exhibit CU, updated November 16, 2022.

439.    Under the PSCSC, "a regular or probationary employee's name shall be placed upon the current reinstatement register…and the person will remain eligible until appointed and/or the register expires, less the person can be found ineligible to be reinstated for cause." *Id.* at 27, Rule 10.02.

440.    With respect to fire positions, "all promotional vacancies shall be filled by the appropriate promotional lists that shall be valid for two years." *Id.* at Rule 10.06(a).

441.    Defendants have authorized reinstatement of firefighters who resigned or retired due to the mandate but have universally concluded that those Plaintiffs who were terminated because of their religious beliefs are not eligible for reinstatement.[27]

442.    Thus stated, if Plaintiffs complied with Defendants demands and resigned or retired, and *did not assert their religious freedoms,* they would be eligible under PSCSC rules to be

---

[27] Plaintiff Steve Collins, retired under force, was reinstated to the employment register, but Defendant Scoggins denied the request, citing a "recent disciplinary history." It is unknown what that discipline was. Mr. Collins attempted to appeal that decision but was told by Andrea Scheel that the decision was final and there was no appeal. Exhibit CV.

COMPLAINT                                        89                **ARNOLD & JACOBOWITZ PPLC**

reinstated. But those who asserted their religious freedoms would be punished by separating under terms the PSCSC would not consider for reinstatement.

443. Thus, the PSCSC is punishing Plaintiffs for exercising religious freedoms, the very reason the Constitution affords protection for religious freedom.

444. Defendants state that because the Civil Service Rules do not have any language allowing reinstatement for "non disciplinary separation," they have summarily concluded that the rules do not apply to allow reinstatement of those Plaintiffs who were denied accommodation despite having a sincerely held religious belief.

445. Plaintiffs have asked Defendants and the Commission, in their discretion, to provide protection to Plaintiffs under PSCSC rules, but were told they were not able to change the rules.

446. However, following this denial, and due to the staffing shortage, the Commission altered the rules to allow reinstatement for retirees and resignees up to five years after resignation or retirement. Exhibit CW. "Due to vacancies at the ranks of Firefighter (SFD) and Police Officer (SPD), the timeframe for a former employee to request return to an eligible (reappointment) register under PSCSC 10.03 has been extended from one (1) to five (5) years after the employees' date of resignation, retirement, or separation due to disability or medical reasons." *Id.*

447. The Commission changed the rules for one class of individuals but refuse to provide that same discretion to those terminated for adherence to their religious faith.

COMPLAINT                                     90                    **ARNOLD & JACOBOWITZ PPLC**

448. Numerous Plaintiffs terminated without accommodation to their sincerely held religious belief have sought reassignment to SFD under the PSCSC rules but were denied. *See, e.g.,* Exhibits CX, CY, and CZ.

449. Defendants' argument is entirely inconsistent, concluding on one hand that Plaintiffs were not terminated but placed on "nondisciplinary separation," Exhibit DA, but they now claim Plaintiffs are "terminated" and thus not eligible for reinstatement under PSCSC rules.

450. Plaintiff Condon specifically highlighted the arbitrary nature of changing the terms of the Rules to extend the timeframe for retirees and resignees, but not providing that same consideration for those terminated for their religious beliefs. *Id.* He was still denied reinstatement.

451. Plaintiff Steve Collins, who retired, was likewise denied reinstatement despite meeting the criteria of PSCSC's own position regarding reinstatement for retirees, based on the "discretion" of Defendant Scoggins having ultimate authority and discretion to reinstate. This is a ruse for discrimination against Plaintiff Collins. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable." *Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1879 (2020).

452. The secular reinstatement process is unavailable to individuals who exercise their religious objections to compulsory vaccination, with the additional step Defendants have taken to single out religious adherents specifically for worse treatment by publicly announcing that religious adherents are categorically excluded from consideration. "In particular we have repeatedly held that the State violates the Free Exercise Clause when

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

it excludes religious observers from otherwise available public benefits." *Carson v. Makin,* 142 S. Ct. 1987 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.,* 485 U.S. 439, 450 (1988)). "But a State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson v. Makin,* No. 20-1088 at *3 (June 21, 2022).

### CAUSES OF ACTION AGAINST DEFENDANTS

**FIRST CAUSE OF ACTION**
**Violation of Washington Law Against Discrimination**
**Perceived Physical Disability**

453. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

454. The Washington Law Against Discrimination (WLAD) prohibits discrimination in the workplace for actual or perceived disability. Wash. Rev. Code § 49.60.180; *Taylor v. Burlington Northern Railroad Holdings,* 193 Wash.2d 611 (2019) (en banc). WLAD's definition of disability is broader than the definition in the ADA. *Pulcino v. Fed. Express Corp.,* 141 Wash.2d 629, 641 n.3 (2000).

455. A disability is defined as "a sensory, mental, or physical impairment that …(i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s *perceived* to exist whether or not it exists in fact." Wash. Rev. Code § 49.60.040(7). Disability is also an impairment that "affects one or more of the … body systems." Wash. Rev. Code § 49.60.040(7)(c)(i).

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

456. The legislature intended to adopt a broad and expansive definition of "disability" to protect against discrimination. *Taylor,* 193 Wash.2d at 618.

457. The EEOC has interpreted these rules to include protection for an actual or perceived immunological condition.

458. Defendants perceived Plaintiffs as having an impairment and/or disability that identified them as presenting a "significant risk of harm."

459. Defendants acted believing Plaintiffs have a perceived physical disability of not having the best protection against COVID-19 in their bodies that conflicted with a stated job requirement defined by Defendants' vaccine mandate.

460. Defendants were aware of this conflict but did not explore any available reasonable alternatives for accommodating Plaintiffs to resolve the conflict. *Suarez v. State,* 23 Wash. App. 2d 609, 517 P.3d 474 (2022).

461. Defendants refused to consider or explore accommodations and refused to balance the undue hardships to the citizens of Washington State, the environment, and the mission of the agency.

462. Defendants terminated Plaintiffs due to their perceived physical disability.

463. Defendants each personally participated in and performed these actions and caused Plaintiffs to suffer damages to be proven at trial, such actions being the actual and proximate cause of those damages.

**SECOND CAUSE OF ACTION**
**Deprivation of Privacy, WA Const. Art. I, Sec. 7**

464. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

COMPLAINT

93

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

465. No person shall be disturbed in his private affairs, or his home invaded, without authority of law. Wash. Const. art. I, § 7.

466. This constitutional right to privacy includes the right to autonomous decision-making and autonomy over one's medical care and includes the right to refuse treatment. *See, e.g., In re Welfare of Colyer,* 99 Wash.2d 114, 119-22, 660 P.2d 738 (1983); *see also* Wash. Rev. Code § 7.70.050.

467. Bodily autonomy is a critical component of the constitutional right of privacy.

468. The decision to suffer the battery of a vaccination is also a private affair which further impacts a citizen's bodily integrity.

469. The Washington State privacy protections under art. I, § 7, are broader than the privacy rights under the U.S. Constitution's Fourth Amendment, as Section 7 guarantees, "an individual's right to privacy *with no express limitations." Robinson v. City of Seattle,* 102 Wash. App. 795 (2000) (emphasis added).

470. In *Reid v. Pierce County,* 136 Wash.2d 195, 961 P.2d 333 (1998), the court held:

    (1)    The RESTATEMENT (SECOND) OF TORTS § 652D (1977) provides the general rule for invasion of privacy. It states:

        RESTATEMENT (SECOND) OF TORTS § 652H (1977) provides for damages available to one who establishes a cause of action for invasion of privacy: "One who has established a cause of action for invasion of his privacy is entitled to recover damages for (a) the harm to his interest in privacy resulting from the invasion; (b) his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion; and (c) special damage of which the invasion is a legal cause."

    (2)    "In *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 580 P.2d 246 (1978), we indicated that a tort action for invasion of the right of privacy exists in Washington."

    (3)    "the tort right is the most widely recognized and established definition of the legal right of privacy"

COMPLAINT              94            **ARNOLD & JACOBOWITZ PPLC**

(4)    "So that no further confusion exists, we explicitly hold the common law right of privacy exists in this state and that individuals may bring a cause of action for invasion of that right."

471.    Plaintiffs have the right to make the decision whether to receive a COVID-19 vaccine and have the right to decide not to disclose their personal medical history – including whether they have been "fully vaccinated" for COVID-19.

472.    Despite these rights, Defendants will continue to violate the privacy rights of every individual seeking employment with SFD.

473.    Despite these rights, Defendants will continue to refuse reemployment to Plaintiffs.

474.    Plaintiffs have been deprived of their rights to privacy by the actions of Defendants in forcing Plaintiffs to violate their religious and/or medical freedoms or suffer loss of employment and loss of pension.

475.    The right to privacy is protected under Wash. Const. art. I, § 7, as a fundamental right which can only be infringed upon by a law which satisfies a strict scrutiny analysis, that is, which furthers a compelling state interest and is narrowly tailored thereto, using the least restrictive means.

476.    Defendants demanded termination of religious and medical objectors who did not vaccinate, alleged in the interest of stopping the spread of COVID-19.

477.    However, the vaccines did not stop infection or transmission, and both the vaccinated and unvaccinated spread COVID-19.

478.    The termination of religious and/or medical objectors did not further the alleged state interest because the efficacy of the vaccines failed. Defendants knew at the time of the

ARNOLD & JACOBOWITZ PPLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

termination that the vaccine was failing, but Defendants purposefully chose to continue with the wrongful termination of religious and medical objectors.

479. Even if the vaccines had worked as promoted, the Defendants failed to utilize a narrowly tailored method to control the spread of virus, leaping directly to termination without considering lesser available means of achieving the alleged objective.

480. Defendants failed to utilize PPE, testing, telework, or natural immunity in stopping the spread of COVID-19, and the method they relied upon – vaccination only – did nothing to stop the spread of the virus, as evidenced by a "cleansed" workforce with high breakthrough numbers of fully vaccinated contracting the virus.

481. Defendants' actions fail strict scrutiny.

482. Defendants' actions would fail even rational-basis review.

483. Additionally, Plaintiffs have been deprived of their right to privacy through the invasive nature of the religious exemption questionnaire which Defendants required them to answer.

484. Defendants each personally participated in and performed these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**Deprivation of Life, Liberty, or Property; U.S. Const. Am. V., Am. XIV; WA Const. Art. I, Sec. 3**

485. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

486. No person shall be deprived of life, liberty, or property, without due process of law. U.S. Const. Ams. V, XIV; Wash. Const. art. I, § 3.

COMPLAINT                                       96                    **ARNOLD & JACOBOWITZ PPLC**

487. Plaintiffs suffered loss of pension rights and benefits as a direct result of the actions of Defendants.

488. Plaintiffs lost title to their real property due to Defendants' actions, had to relocate at considerable loss in the sale of that property, which are losses they cannot recover.

489. Public employees have a property interest in their pensions, which cannot be unilaterally altered to the material disadvantage of the employee. *Eagan v. Spellman,* 90 Wash.2d 248 (1978).

490. Public employees have a property interest in their employment, cannot be terminated without "just cause," and cannot be terminated without due process, which includes a fair hearing. *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

491. "While a return to normalcy is desired, the cost of the return should never jeopardize religious liberty. As Justice Gorsuch recently explained, 'Even if the Constitution has taken a holiday during the pandemic, it cannot become a sabbatical.' *Roman Cath. Diocese of Brooklyn v. Cuomo* 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). In this Court's opinion, assuming the Constitution has taken a holiday, this holiday is long over, and it needs to get back to work, NOW." *Hunter Doster, et al. v Hon. Frank Kendall,* 1:22-cv-00084_MWM, Doc #47 at 2 (S.D. Ohio, Mar. 3, 2022).

492. Plaintiffs were terminated from public employment without a hearing or other due process.

493. The law regarding due process in employment is well established.

COMPLAINT 97 **ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

494. Defendants knew the Fourteenth Amendment prohibits government from denying an employee due process.

495. Defendants each personally participated in and performed these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Violation of the Equal Protection Clause of the WA Const. Art. I, Sec. 3**

496. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

497. Wash. Const. art. I, § 3, states that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

498. If a law neither burdens a fundamental right nor targets a suspect class, it will be upheld so long as it bears a rational relation to some legitimate end. *Romer v. Evans,* 517 U.S. 620, 631 (1996).

499. There was no rational relation to some legitimate government end because the action taken – termination of the unvaccinated – did not further the interest of reducing the spread of COVID-19 given that the vaccinated and the unvaccinated both contract and transmit COVID-19.

500. In fact, people who are vaccinated for COVID-19 are more likely to become infected with and spread COVID-19 than are people who have recovered from COVID-19 and have natural immunity.

501. Defendants have treated different classes of people unequally, with the protected class of religious objectors not coincidentally being adversely impacted by the actions of Defendants.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

502. The actions of Defendants, on its face and as applied, was not rationally related to a legitimate end.

503. The actions of Defendants have caused, are causing, and will continue to cause irreparable harm and actual and undue hardship to Plaintiffs.

504. Defendants' actions caused Plaintiffs to suffer damages to be proven at trial, such actions being the actual and proximate cause of those damages.

### FIFTH CAUSE OF ACTION
### Deprivation of Religious Freedom, WA Const. Art. I, Sec. 11

505. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

506. Defendants' vaccination mandate and religious exemption questionnaire are contrary to and transgress Wash. Const. art I, § 11, which states, "Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion…No religious qualification shall be required for any public office or employment."

507. Plaintiffs' absolute right to religious freedom has been infringed.

508. Defendants, by their conduct and words, discriminated against the Plaintiffs for acting according to their conscience, guided by their religious faith, in refusing to be vaccinated.

509. Defendants' vaccination mandate, in conjunction with their religious exemption questionnaire, by design and intent, impose a religious qualification for public employment, and deny Plaintiffs' absolute freedom of conscience in all matters of

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

religious sentiment, belief and worship, and result in an unauthorized molestation or disturbance of the Plaintiffs' persons and property rights on account of religion.

510. Defendants each personally performed and participated in these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

## SIXTH CAUSE OF ACTION
## Wage Theft

511. Plaintiffs here reallege the allegations set forth above in this Complaint.

512. Defendants have, willfully and with the intent to deprive, failed to pay wages to the Plaintiffs since the date of their respective terminations.

513. Defendants had a pre-existing duty under contract to pay Plaintiffs the specific compensation as set forth in their employment contracts.

514. Defendants were aware at the time of termination that Plaintiffs were being treated differently than secular and non-medical objectors by requiring religious and medical objectors to receive a vaccine to prevent infection, knowing that both the vaccinated and the unvaccinated both contracted and spread the COVID-19 virus equally, and affirmatively elected to ignore the established science.

515. Defendants have authority and control over the employment status and payment of wages to Plaintiffs.

516. Plaintiffs did not knowingly submit to the deprivation of wages.

517. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial, including at least lost wages and lost benefits, including pensions.

518. Defendants each personally participated and performed these actions that are the actual and proximate cause of Plaintiffs' damages.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

519. Plaintiffs not yet reinstated are entitled to back wages, and for all Plaintiffs to double damages, costs of suit and reasonable attorney fees, Wash. Rev. Code § 49.52.070.

**SEVENTH CAUSE OF ACTION**
**Breach of Contract**
**U.S. Const. Art. I, Sec. 10, Cl. 1; Wash. Const. Art. I, Sec. 23.**

520. Plaintiffs here reallege the allegations set forth above in this Complaint.

521. There existed a binding contract between each Plaintiff and the Department that permitted termination only for "just cause."

522. Each Plaintiffs substantially performed their obligations under this contract.

523. The Department breached its contracts with Plaintiffs by terminating them without just cause.

524. Defendants' wrongful termination of Plaintiffs was based on a new condition of employment that was not part of Plaintiffs' contract when hired.

525. A vaccine mandate is a "private, irreversible medical decision made in consultation with private medical professionals outside the federal workplace," and is not a "working condition" of employment. *Feds for Medical Freedom et al. v. Joseph Biden et al.,* No. 22-40043 (5th Cir. March 23, 2023) at 14, 28, 30.

526. Defendants' actions violated Plaintiffs' right to continued employment by terminating them without "just cause" and wrongly characterizing that private medical decision made outside the workplace as a new condition of employment without consideration.

527. Defendants' action also violated Plaintiffs' pension rights, likewise, established by contract.

COMPLAINT

101

528. Defendants' actions caused a substantial change to the pension rights of Plaintiffs established by Wash. Rev. Code Title 41 *et. seq.*

529. Plaintiffs have suffered extraordinary financial loss because of the substantial change in their pension rights without cause.

530. Defendants each personally participated in and performed these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial, including at least lost wages and lost pensions.

**EIGHTH CAUSE OF ACTION**
**Violation of the Washington Law Against Discrimination**
**Failure to Accommodate**

531. Plaintiffs here reallege the allegations set forth above in this Complaint.

532. Each Plaintiff was found by the Department to have a sincerely held religious belief preventing vaccination and was granted an exemption, and/or was granted a medical exemption preventing vaccination due to a medical condition.

533. Defendants were aware of these exemptions.

534. Plaintiffs made repeated requests for accommodations but were shut down without discussion.

535. Defendants failed to consider any of the accommodations proposed by Plaintiffs.

536. Defendants stated that reassignment was the only possible accommodation, but then universally denied reassignment to terminated employees.

537. Plaintiffs were forced to either (a) disregard their sincerely held religious beliefs, and/or put their health at risk, or (b) lose their positions, seniority, pensions, professions, and livelihoods.

COMPLAINT                                       102                    **ARNOLD & JACOBOWITZ PPLC**

538. Plaintiffs were forced to either be terminated or take a vaccine in direct violation of their sincerely held religious beliefs in order to feed their families.

539. Strict scrutiny applies where fundamental rights are concerned.

540. Where the mandated vaccine does not prevent infection or transmission, Defendants' actions, *and the continuance thereof,* are arbitrary and capricious and fail even a rational basis review.

541. Defendants each personally performed and participated in these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**NINTH CAUSE OF ACTION**
**Violation of the Washington Law Against Discrimination**
**Disparate Impact**

542. Plaintiffs here reallege the allegations set forth above in this Complaint.

543. To the extent that Defendants' policy is facially neutral, it falls more harshly upon those within a protected class.

544. The Plaintiffs have been damaged by the disparate impact of the Defendants' policy.

545. Defendants each personally participated in and performed these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**TENTH CAUSE OF ACTION**
**Violation of the First Amendment of the United States Constitution**
**Free Exercise**

546. Plaintiffs here reallege the allegations set forth above in this Complaint.

547. The First Amendment of the U.S. Constitution provides that: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." This

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

clause has been incorporated against the states. *Cantwell v. Connecticut,* 310 U.S. 296 (1940).

548. Courts should not inquire into the validity or plausibility of a person's beliefs; instead the task is to determine whether "the beliefs professed []are sincerely held and whether they are, in [a believer's] own scheme of things, religious." *United States v. Seeger,* 380 U.S. 163, 185 (1965).

549. Plaintiffs' sincerely held religious beliefs that prohibit them from taking the COVID-19 vaccinations have been unconstitutionally burdened by Defendants. Plaintiffs' accommodations were universally denied.

550. Defendants have pitted Plaintiffs' consciences against their ability to work. The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin,* 142 S. Ct. 1987 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.,* 485 U.S. 439, 450 (1988)). "In particular, we have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.*

551. Defendants openly stated that religious accommodations would be denied, but secular (i.e., medical) accommodations were allowed. Here, with regard to regulating the conduct of its secular and religious citizens, the government holds the same interest in preventing disease. Further, the secular and religious activities at issue are not only comparable, but they are also exactly the same, seeking exemption from compulsory vaccination.

COMPLAINT                                     104                    **ARNOLD & JACOBOWITZ PPLC**

552. A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). While defendants may have a general healthcare interest in preventing the spread of disease, its interest is not so extraordinary as to prohibit an accommodation for religious reasons, which poses a similar contagion hazard as a hypothetical medical accommodation.

553. Government regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

554. Defendants have instituted a system that includes 2 levels of personalized discretionary review. The Defendants have delegated private healthcare providers discretion to determine what broad variety of circumstances are eligible for a medical exemption, and which are not. Acting on behalf of the state, these physicians conduct an individualized assessment of each potential medical exemption. If and when the medical exemption form is signed by a physician, it is then submitted to Defendants to enter yet another discretionary process of affording an accommodation.

555. Defendants vaccination policy thus fails the general applicability test on additional, alternative grounds because the medical exemption system provides for individualized discretionary review. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable...." *Fulton,* 141 S. Ct. at 1879.

**ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

556. All the acts of Defendants were conducted by them under color and pretense of the statutes, regulations, customs, policies, and/or usages of the State of Washington and the Washington Department of Transportation.

557. Defendants knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

558. Defendants acted with willful malice, and/or intentionally and in gross disregard of Plaintiffs' constitutional rights, and/or in reckless disregard of Plaintiffs' constitutional rights.

559. As a direct and proximate result of Defendants' actions, Plaintiffs have been deprived of their constitutional rights to the free exercise of religion and to be free from governmental hostility directed at their religion and have been denied their rights to due process and equal protection under the law.

560. Defendants each personally participated in and performed these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**Violation of Right to be Free from Arbitrary and Capricious Action**

561. The Plaintiffs here reallege the allegations set forth above in this Complaint.

562. The Plaintiffs have a "fundamental right" "to be free from arbitrary and capricious government action. *Pierce Cnty. Sheriff v. Civ. Serv. Comm'n of Pierce Cnty.*, 98 Wash.2d 690, 693–94 (1983).

563. In light of the CDC's latest guidance, and the City of Seattle's similarly revised guidance, and/or with the current knowledge that the vaccines do not prevent transmission, the "vaccinate or terminate" policy at issue in this case is arbitrary and capricious.

COMPLAINT                                    106                    **ARNOLD & JACOBOWITZ PPLC**
                                                                     8201 164th Avenue NE, Suite 200
                                                                     Redmond, WA 98052
                                                                     (206) 799-4221

564. The Plaintiffs have each been adversely impacted by the Defendants' arbitrary and capricious conduct, in which each Defendant personally participated and performed.

565. The Plaintiffs have been damaged in an amount to be proved at trial.

## TWELVTH CAUSE OF ACTION
### Public Policy Tort Claim Against Religious Discrimination

566. The Plaintiffs here reallege the allegations set forth above in this Complaint.

567. The Plaintiffs hold sincere religious beliefs.

568. Defendants acknowledged and accepted the sincerity of the religious beliefs of each Plaintiff.

569. Plaintiffs were each terminated for practicing their religion, which is a legal right of each Plaintiff.

570. Plaintiffs were terminated in retaliation for exercising their religious beliefs.

571. Plaintiffs each had employment agreements that they could only be terminated for just cause.

572. Plaintiffs' terminations violate a precept of public policy that prohibits employment discrimination without just cause.

573. Plaintiffs' each had employment agreements containing express or implied provisions that they would be employed so long as they satisfactorily performed the services expected of them, protecting them from discharge for reasons other than good faith dissatisfaction by the employer.

574. Each of the Plaintiffs have a tort action for damages to redress injuries and damages caused by their termination and are entitled to judgment therefor.

COMPLAINT                              107                **ARNOLD & JACOBOWITZ PPLC**
                                                          8201 164th Avenue NE, Suite 200
                                                          Redmond, WA 98052
                                                          (206) 799-4221

**THIRTEENTH CAUSE OF ACTION**
**Violation of the "Takings Clause"**
**U.S. Const. Amend V; Wash. Const. Art. 1, Sec. 16**

575.  The Plaintiffs here reallege the allegations set forth above in this Complaint.

576.  Both the United States and the Washington Constitutions prohibit the taking of private property for public use without just compensation. U.S. Const. amend. V; Wash. Const. art. I, § 16; *see Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 536-37 (2005) (characterizing the takings clause as placing a *condition* on the exercise of the power to take private property).

577.  Plaintiffs each were deprived of wages, pension rights, and other contractual benefits of employment by the wrongful actions of Defendants.

578.  "A regulation that is otherwise a valid exercise of police power may go 'too far' in its impact on a property owner as to constitute a taking, requiring compensation." *Washington Food Industry Association & Maplebear, Inc., d/b/a Instacart v. City of Seattle,* 1 Wash.3d 1, 30, 524 P.3d 181, 196 (2023) (en banc) (quoting *Chong Yim v. City of Seattle,* 194 Wash.2d 651, 658-59 (2019) (quoting *Pa. Coal Co. v. Mahon,* 260 U.S. 393, 415 (1922)), *Chevron,* 544 U.S. at 543 (holding that an inquiry into a regulation's validity is "logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose.")

579.  Intangible property rights, including valid contracts, are protected by the takings clause. *Id.*

580.    Plaintiffs each had an employment contract with the Defendants that constitutes property for the purposes of the takings clause.

581.    Each of the Plaintiffs has a claim for damages to redress injuries and damages caused by their termination the taking of their property and are entitled to judgment therefor.

582.    Defendants each personally participated in and performed these actions that proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

COMPLAINT                                   109                **ARNOLD & JACOBOWITZ PPLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

### III.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, pray for the following relief against the Defendants:

1.  Judgment against all Defendants on all claims.

2.  Money judgment for back pay and front pay, loss of benefits, and loss of pension rights, for those Plaintiffs who were terminated or forced to quit.

3.  Money judgment for back pay, loss of benefits, and loss of pension rights, for any reinstated Plaintiffs, to the extent they are reinstated.

4.  Double damages for lost wages pursuant to Wash. Rev. Code § 49.52.070.

5.  Money judgment for all Plaintiffs pursuant to the infringement upon their constitutional and statutory rights.

6.  Attorney fees as authorized by State and Federal statute.

7.  Such other and further relief that is just and equitable.

DATED this 20th day of July 2023.

**ARNOLD & JACOBOWITZ PLLC**

*s/ Nathan J. Arnold*
Nathan J. Arnold, WSBA #45356
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221
Nathan@CAJLawyers.com
*Counsel for Plaintiffs*